**CASE NO. 23-4675**

# IN THE
# 𝕌𝕟𝕚𝕥𝕖𝕕 𝕊𝕥𝕒𝕥𝕖𝕤 ℂ𝕠𝕦𝕣𝕥 𝕠𝕗 𝔸𝕡𝕡𝕖𝕒𝕝𝕤
## FOR THE FOURTH CIRCUIT

UNITED STATES OF AMERICA,

*Plaintiff-Appellee,*

v.

ROSE-MARIE NSAHLAI,

*Defendant-Appellant.*

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
AT ALEXANDRIA

**OPENING BRIEF OF APPELLANT**

Marvin D. Miller
LAW OFFICES OF MARVIN D. MILLER
1203 Duke Street
Alexandria, VA 22314
703-548-5000
OFC@mdmillerlaw.com

*Counsel for Appellant*

# TABLE OF CONTENTS

**Page(s)**

Table of Authorities...................................................................iii

Jurisdictional Statement.............................................................1

Issues Presented For Review .....................................................1

Statement of the Case ...............................................................3

I.     Overview...........................................................................3

II.    The Indictment .................................................................5

III.   Pretrial Denial of the Defense .........................................6

IV.    Circumstantial Evidence of Knowledge............................9

V.     Excluded Defense Evidence – Reasonable Doubt
       About the Required *Mens Rea*. ............................................17

VI.    Failure to Give the Jury Proper Instruction on
       the Law...........................................................................21

       A.    Abused – Unquestioning – No *Mens Rea.* ...........................21

       B.    Failure to Properly Instruct on Conspiracy .....................23

Summary of the Argument .....................................................26

Argument................................................................................27

I.     Rose-Marie Nsahlai Was Denied the Right To Defend.................27

       A.    This Indictment Required Proof of Specific Intent
             for Each Offense, i.e. Knowledge of No Employees.............27

i

B.    Misapplication of Law on Duress ......................................... 31

       1.    Standard of Review ....................................................... 31

       2.    Misunderstanding the Law of Duress ........................ 31

C.    The Right to Defend ................................................................. 33

D.    Evidence Negating Specific Intent Is Relevant .................... 38

       1.    Standard of Review ....................................................... 39

       2.    Appellant's State of Mind Was Relevant
             to Her Knowledge .......................................................... 39

E.    It Was Up to the Jury to Decide Whether Being
       An Abused Woman Negated *Mens Rea* ................................ 42

       1.    *Mens Rea* Is Affected By Abuse ................................... 42

II.   Erroneous Instruction on Count 1's Relationship to
       Counts 4 and 5 Also Violated the Fifth
       Amendment Right to an Indictment ...................................... 49

A.    Standard of Review ................................................................. 49

B.    The Right to an Indictment Which Provides Notice ............ 50

C.    Erroneous Instruction on Count 1's Relation to Counts
       4 and 5. ...................................................................................... 55

Conclusion ........................................................................................... 56

Request for Oral Argument ................................................................ 57

Certificate of Compliance ................................................................... 57

Certificate of Service ........................................................................... 58

ii

## TABLE OF AUTHORITIES

**Case**                                                    **Page(s)**

*Alleyne v. United States,*
    570 U.S. 99 (2013) ............................................................53

*Arcoran v. United States,*
    929 F. 2d 1235 (8thCir.1991) ....................................46-47

*Cullins v. Pond Creek Mining Company,*
    468 F.3d 213 (4thCir. 2006) ..........................................31

*Groppi v. Leslie,*
    404 U.S. 496 (1972) ..................................................52, 53

*In Re Oliver,*
    333 U.S. 257 (1948) ..................................................36, 53

*In Re Winship,*
    397 U.S. 358 (1976) ......................................................29

*Milburn Collery Co. v. Hicks,*
    138 F.3d 524 (4th Cir. 1998)........................................31

*Mullane v. Central Hanover Trust Co.,*
    339 U.S. 306 (1950) ......................................................52

*Ocasio v. United States,*
    578 U.S. 282 (2016) ......................................................51

*Ring v. Arizona,*
    536 U.S. 584 (2002) ................................................51, 52

*Rock v. Arkansas,*
    483 U.S. 44 (1987) ........................................................35

*South Atlantic Limited Partnership of Tennessee v. Riese,*
 284 F.3d 318 (4thCir. 2002) .......................................... 28

*United States v. Bailey,*
 444 U.S. 394 (1980) ....................................................... 32

*United States v. Bales,*
 813 F.2d 1289 (4thCir. 1997) ...................................... 28

*United States v. Farrell,*
 921 F.3d 116 (4thCir. 2019) ........................................ 37

*United States v. Gilliam,*
 975 F.2d 1050 (4thCir. 1992) ...................................... 29

*United States v. Godwin,*
 272 F.3d 659 (4thCir. 2001) ........................................ 29

*United States v. Head,*
 641 F.2d 174 (4thCir. 1981) ....................................55-56

*United States v. Hedgepeth,*
 418 F.3d 411 (4thCir. 2005) ........................................ 39

*United States v. Hutchinson,*
 388 F.3d 991 (4thCir. 1964) ........................................ 55

*United States v. Johnson,*
 956 F.2d 894 (9thCir.1991) .................................... 46, 47

*United States v. Leftenant,*
 341 F.3d 338 (4thCir. 2003) ........................................ 39

*United States v. Lewis,*
 53 F.3d 29 (4thCir. 1995) ............................................ 56

*United States v. Marenghi,*
 893 F.Supp. 85 (USDC Maine 1995)............................ 48

*United States v. Muslim,*
    944 F.3d 154 (4thCir. 2019) .................................................... 31, 39

*United States v. O'Brien,*
    560 U.S. 218 (2010) ........................................................................ 53

*United States v. Polowichak,*
    783 F.2d 410 (4thCir. 1986) ......................................................... 56

*United States v. Queen,*
    132 F.3d 991 (4thCir. 1997) .................................................... 40, 41

*United States v. Ravenell,*
    ___ F.3d ___ (4thCir.2023)(April 23, 2023) .................................... 37

*United States v. Russell,*
    971 F.2d 1098 (4thCir. 1992) ........................................................ 49

*United States v. Wells,*
    519 U.S. 482 (1997) .................................................................... 49, 55

*United States v. Whaley,*
    786 F.2d 1229 (4thCir. 1986) ....................................................... 27

*Washington v. Texas,*
    388 U.S. 14 (1967) ......................................................................... 36

| Statute | Page |
|---|---|

18 U.S.C.§1344  .................................................................... 5, 28

18 U.S.C.§1349  ........................................................... 5, 25, 50, 51

18 U.S.C.§1957  ....................................................................... *passim*

18 U.S.C. §3231  .......................................................................... 1

28 U.S.C. §1291  .......................................................................... 1


**Constitutional Provision**

Fifth Amendment .................................................................. *passim*


**Other Sources**

Federal Rules of Criminal Procedure 7 ............................................ 53, 54

Federal Rules of Evidence 401 ....................................................... 39, 40

Black's Law Dictionary, 7th Edition at 999............................................ 29

Diagnostic and Statistical Manual – Fifth Edition,
American Psychological Association .................................................. 42-43

National Institute of Justice Report, *Extent, Nature, and
Consequence of Intimate Partner Violence*
Released in July 2000 .................................................................. 43

The Battered Woman Syndrome, New York:  Springer; 1984 ............... 43

*Intimate Partner Violence*, Medical News Today
Zawn Villines, updated in August 2022.................................................. 45

## JURISDICTIONAL STATEMENT

This is an appeal of a final sentencing order and judgment of the United States District Court for the Eastern District of Virginia, Alexandria Division, entered on 18 October 2023. The district court had jurisdiction over this case pursuant to 18 U.S.C. §3231. The Notice of Appeal was timely filed on 30 October 2023. This Court has jurisdiction pursuant to 28 U.S.C. §1291.

## ISSUES PRESENTED FOR REVIEW

The issues present for review are the following errors by the district court:

I.     Denying Appellant the right to present her defense to the *mens rea* element of Counts 1, 2, and 3 that she did not know that two businesses created by the man she had just newly married did not have any employees when she assembled the payroll spread sheets he used to apply for Payroll Protection Plan loans and she did not question that man about whether he had employees because he had her in a physically and psychologically abusive relationship in which he was controlling and domineering.

- 1 -

II.    Denying Appellant the right to present her defense to the *mens rea* element of Counts 4 and 5 that she did not know that the PPP Loans for the two businesses created by the man she had just newly married were fraudulent because he did not have any employees when she assembled the payroll spread sheets he used to apply for Payroll Protection Plan loans and she did not question that man about whether he had employees because he had her in a physically and psychologically abusive relationship in which he was controlling and domineering.

III.    Allowing the prosecution to present circumstantial evidence from which they argued the jury could infer the *mens rea* required for each count of the indictment while denying the defense the right to present facts and circumstances about the abusive, controlling, and domineering relationship Appellant had with her just newly married husband from which the defense would have been able to argue that there was a reasonable doubt as to whether Appellant had the required *mens rea* for each count.

IV.    Improperly instructing the jury that conviction of the conspiracy charged in Count 1 could justify conviction of Counts 4 and 5.

## STATEMENT OF THE CASE

### I.    Overview.

This case had its origins when Appellant, recently and unexpectedly widowed from her husband of 17 years, met and was pursued by a charismatic, charming, international business man, Didier Kindambu.  They dated a couple of months and he persuaded her to marry him in December 2019.  (JA466).  Kindambu created a physically and psychologically abusive relationship in which he dominated and controlled Appellant.  He had her assemble the payroll spreadsheets he used to apply for Payroll Protection Plan (PPP) loans for two of his companies, Papillon Air, which he incorporated in June 2019, and Papillon Holdings, which he incorporated in September 2018.  (JA513; JA516).  She did not know that his companies had no employees when she compiled the payroll spreadsheet forms he used for the loans, and did not question him because of the consequences due to his abusive relationship with her.  There was no direct, only circumstantial, evidence inferring she knew his two companies had no employees, but

the court would not allow her to explain why she did not know and did not question him about employees.  (JA100; JA102).

A friend of Kindambu, known as "Kobe", a banker at Bank of America, encouraged him to apply for the loans and helped guide the process, for which Kindambu paid Kobe $20,000.00.  (JA805, JA806). When Appellant's new husband was arrested in October 2020, he made a plea bargain for a greatly reduced sentence in which he claimed to the prosecution that she was criminally involved in his fraud scheme.  By the time of her trial in February 2023, the prosecution would not present him to the jury as their witness.

The trial court would not allow Appellant to present evidence about Kindambu's psychological and physical abuse and the resultant controlling, domineering relationship he had over her.  (JA102).  Her attorney was forbidden to utter the words psychological abuse, physical abuse, domineering, or controlling to the jury.  (JA837).  She was not allowed to explain to the jury that, at the time of the loan applications, she was unaware that her new husband's companies had no employees and did not question him because of the abusive, domineering and controlling nature of his relationship with her.  The trial court would

- 4 -

allow her to testify about and present evidence of Kindambu's
controlling, psychological and physically abusive relationship only if she
admitted to the criminal charges and asserted a defense of duress:
imminent threat that Kindambu would kill her or inflict serious bodily
injury unless she committed a crime. (JA98-101).  That was not the
defense.  (JA98-102).  There was an abusive, controlling relationship
which impacted *mens rea,* but there was no imminent threat he would
kill her or attack with such violence as to cause significant bodily
injury.

## II.    The Indictment.

The indictment charged a conspiracy to commit bank fraud, 18
U.S.C.§1349, in Count 1, and two related, substantive bank fraud
offenses, 18 U.S.C.§1344(2), in Counts 2 and 3, for the two PPP loans
Kindambu's companies sought and received.  Appellant's alleged
involvement was, essentially, based on the claim that she knew there
were no employees for the two companies at the time she assembled the
payroll spreadsheets Kindambu used for his loan applications for his
companies.

- 5 -

Counts 4 and 5 were separate, stand-alone charges based on the allegation that, after the loans in the conspiracy were granted, the proceeds of the loans were used in two unlawful financial transactions in violation of 18 U.S.C.§1957.  Counts 5 and 6 were dismissed by the prosecution.

## III.  Pretrial Denial of the Defense.

After jury selection and before the commencement of the evidence, the court heard arguments regarding the admissibility of evidence. Each side had filed trial briefs.  The prosecution also filed a Motion in Limine.  They wanted to exclude any defense evidence or argument about Kindambu's domestic abuse, domination, and control of Appellant and its consequences on her actions.  (JA98).  They cast the defense in terms of duress, but the defense did not intend to present a duress defense because it requires Appellant to admit she committed the offense, and then explain that she did it because of fear of imminent death or serious bodily injury at his hands of Kindambu.  (JA99).  He had her in an abusive, controlling relationship, but she did not face imminent death or serious bodily injury at his hands when she compiled

employee spreadsheets used for his companies' loans.  The defense was
not that Appellant committed an illegal act; rather, the defense was
that she did not know and did not look into whether there were
employees because of the overall circumstance of Kindambu's abusive,
controlling, and dominant relationship with her.  (JA99-101).

Charges of bank fraud, Counts 1, 2, and 3, and money laundering,
Counts 4 and 5, are specific intent crimes requiring proof that the
accused acted with the necessary *mens rea* or scienter.  To have the
required *mens rea* or scienter, she had to know there were no employees
for his PPP loans for all five counts.  There was no direct evidence that
Appellant knew that her new husband's businesses had no employees
when he applied for the two PPP loans using the payroll spreadsheets
she had assembled for him.  The prosecution would not have him
appear before the jury as their witness.  The defense was not allowed to
present evidence explaining that, because of Kindambu's abusive,
controlling, and domineering relationship with her, Rose-Marie would
not question him about employees.  Even though she could testify that
she did not know he did not have employees, she was not allowed to

- 7 -

explain that she did not know because she did not question him on account of his psychological and physical abuse of her in a relationship where he dominated and controlled her. (JA100-102). The jury was not allowed to consider whether that defense created a reasonable doubt for the required element of *mens rea*.

Defense counsel asked the court to let the jury hear a surreptitious tape recording, made by Kindambu's daughter, of a conversation she had with Appellant, during which Appellant told her about the physical and psychological abuse inflicted on her by Kindambu. (JA99-100; JA446). The defense wanted the jury to be allowed to consider whether an abused spouse, such as Appellant, could be pressured into doing things and to not question it because they do not want to deal with the consequences of asking questions in their abusive relationship. (JA101). Defense counsel made clear to the court that Appellant did not question inferences which may have led to questions– the curtain was not pulled back – for a reason, she was an abused woman, but the jury was not allowed to know and give that whatever consideration they felt it deserved. (JA99-101; JA837).

- 8 -

The court would not allow the defense to utter the words "abused" or "beaten" or use any language that was "anything like that" before the jury. (JA485; JA837). The defendant could not testify to explain to the jury that she felt compelled, by her abusive relationship with her husband, to compile the payroll sheets for his loans without question. (JA102). During the fourth day of trial, the defense again sought to introduce the full tape recording, secretly made by Kindambu's daughter, to show spousal abuse by Kindambu, but the court would not allow any reference to "spousal abuse", "abuse", "beaten", or "anything like that." (JA837).

Just before instructions and closing argument, the court reiterated to the defense, at the request of the prosecution, that use of words such as "controlling, abusive, dominant, that type of language, will not be allowed to be argued to the jury in closing argument." (JA837).

## IV. Circumstantial Evidence of Knowledge.

During trial, the prosecution established that on 3 April 2020 Kindambu applied for two PPP loans – one for his company Papillon Holdings, which yielded a loan in the amount $375,000.00 and another

- 9 -

for Papillon Air, resulting in $2,146,753.00.  He signed the loan
applications and the promissory notes, certifying that what was in his
application was true.  (JA156, JA177).  She assembled the payroll
spreadsheets submitted with the applications.  At trial, the government
would not call their cooperating witness, Kindambu, to testify.  He did
not say she knew he had no employees nor deny his abusive,
domineering, and controlling relationship.  The prosecution's main
thrust was that circumstantial evidence inferred she knew there were
no employees.

The format for the spreadsheets themselves came from a payroll
company - ADP.  Kindambu's Bank of America banker friend, Kobe,
introduced Kindambu to another friend of his, who worked at a payroll
processing company, ADP.  (JA232-233).  Kindambu let on that he
would be hiring the company for his payroll, resulting in the payroll
spreadsheet format from another ADP client being provided to
Appellant by ADP.  (JA247; JA250).  Kindambu had no payroll records
of FICA withholding; and she did not question him.  She completed the
computations for federal and state taxes, Social Security withholding,

and the like, for employees and entered put it on the forms she had
received.  The forms then had the data in the categories on the format
given to her.  When filed, they had no company logo from ADP's other
client and appeared to be standard payroll forms.

Kindambu did not deny that he provided the employee names and
annual salary amounts but Appellant was not allowed to testify that
she did not question him about them and his not having previously paid
FICA withholding as a consequence of the psychologically and
physically abusive relationship he had created with her in which he
dominated and controlled of her.  (JA102; JA837).

In the prosecution effort to present evidence from which they
could argue the jury should infer that Appellant knew Kindambu's
companies had no employees, prosecution witness, Odenwaldt, testified
that, just as the Pandemic was hitting in 2020, (JA275), he was at the
offices of Papillon Air at the Leesburg Airport and there were four or
five computers in the offices and there was construction going on to get
the building ready.  (JA276, JA279).  He saw no employees working
there at that time.  (JA280).  Appellant was engaged in tasks assigned

by Kindambu.  (JA279).  Odenwaldt also confirmed Appellant appeared to want Kindambu's approval and that Kindambu, whose online presence was of an international businessman, would be flown around to different parts of the United States by a local private pilot.  (JA285-286; JA293-294).

Kindambu's daughter testified that she was at the Papillon Air offices at the Leesburg Airport one or two times per week during the pandemic, March and April 2020, and they were under construction.  (JA452).  Appellant was there with her government laptop for her federal job and with another laptop.   (JA452).  She saw no employees working there.  Other prosecution witnesses from state and federal agencies confirmed that Kindambu's two businesses had no known employees and paid no taxes.

The trial issue was Appellant's lack of knowledge and why she did not question Kindambu about his employees.  As the court instructed the jury, they had to find that she knew the representations in the spread sheets (about employees) were untrue when made and they could also find she had the requisite knowledge if they found she acted

- 12 -

with "reckless indifference" to whether the employee spreadsheets were true.  (JA878).  She was not, however, permitted to explain why she did not question her abusive husband and was not recklessly indifferent because of how he used his abusive relationship to control and dominate her.  (JA98-101; JA837).  The prosecution did not deny that was the nature of Kindambu's relationship with her; they just did not want the jury to be allowed to consider it and the court sided with them.  (JA98-102; JA837).

On the secretly made recording of Appellant made by Kindambu's daughter to help her dad after his October 2020 arrest, Appellant explains that the loan money will be "scott free" because of how she did it.  (JA463; JA924).  The PPP loan program excused repayment when most of the money was used for payroll, thus, she thought it would be excused, i.e., it would be "scott free", because she thought he had employees and that's how most of it would be used.

Other circumstantial evidence presented by the prosecution about her alleged knowledge came in the form of text messages and emails between her and their absent witness, Kindambu.  What was said in

person or on telephone calls between them was not in evidence. The
Case Agent, Sublett, did not know what he said in calls or face to face
conversations nor, from Kindambu, what she said in those
conversations. (JA701). They would not use Kindambu as a
government witness.

Most of the text and email content was presented by chief case
Agent Sublett. Agent Sublett testified about communications between
Appellant and Kindambu where she indicated that she would have to
manually compute the withholdings for state, federal, and Social
Security, etc. (JA545). This was for the payroll spreadsheets which she
was the last to edit before they were submitted with Kindambu's loan
applications. (JA540). Appellant had to figure out how the payments
could be justified (JA560) but whether that meant she was looking to
see if the math was internally accurate or something else was not
explained. She said she grossly exaggerated his, Kindambu's monthly
expenses, (JA563), as his banker Kobe had suggested - 2.5 times
Kindambu's expenses. (JA563). What she said, however, did not mean
she knew there were no employees; rather, she said she exaggerated the

- 14 -

expenses for his employees as advised by Kobe, his banker.  (JA563).

The banker worked for Bank of America, where the loan applications

were made.  Kindambu did not testify about what, if anything, he told

her about his employees.   Kobe also did not testify about what he told

her.  Appellant was not allowed to testify in her own defense to explain

that she did not question Kindambu because of his abusive,

domineering control.  (JA99-102; JA837).

She said things in emails, via WhatsApp, and in text messages to

the effect of we'll create the payroll reports for the periods stated by

employee; the SBA is not the IRS, so if you're ready to take a leap of

faith and take a chance, we'll figure it out.  (JA558).  Since she had

never prepared a payroll spreadsheet, her statements could mean she

would figure out how to prepare one for the employees and salaries he

gave her; PPP loans were brand new, who knows how they worked; was

he really qualified?  There are lots of implications and more than one

way to interpret what was said.  While another person might have

asked questions, she was not allowed to explain why she did not.

(JA102; JA837).  Notably, the jury was instructed on "reckless

- 15 -

indifference", but kept in the dark about why she did not question her newly married abusive husband and was not recklessly indifferent.

The messages introduced by the prosecution could imply she had the required scienter or *mens rea* just as well as not. She said taxes should be paid but his not paying taxes for his employees is not direct evidence that she knew there were no employees. (JA560). She also tells Kindambu that they know the risk (JA560), but is that a risk because he is asking for a payroll loan with no employees or is the risk because it is a brand new program and nobody knows exactly what is going on or whether it will work; which is unknown. They also communicate about people who were prosecuted for misapplying loan money, but what they said in personal conversations with each other and what he told her about his businesses is not known. (JA701). Kindambu did not say what he told her about his employees nor what he told her to do. He did not deny his abusive relationship. He simply was not called as a prosecution witness. The defense was not allowed to present its evidence on the subject. The court prohibited it. She was not recklessly indifferent, but the jury did not hear about that.

- 16 -

There was a communication with Wells Fargo on 27 April 2020, after the loan applications, where that bank was informed, in a message from her, transmitting a document whose origin was not explained, that Papillon Air was not doing business in 2019, until December when it received authorization to operate out of the Leesburg Airport, and, for that reason, it did not have to pay taxes for 2019. (JA959). That does not establish the knew about Kindambu's company, in a holding pattern and waiting to swing into action. He did not say he told her he had no employees being paid and ready to proceed once the licensure was granted.[1] (JA600-603; JA959).

## V. Excluded Defense Evidence – Reasonable Doubt About the Required *Mens Rea*

As established, the court would not allow Appellant to testify and explain why she did not have the requisite *mens rea* for this case because she did not question the abusive, controlling Kindambu. Had

---

[1] There is a prosecution exhibit, (JA912) which lists Rose-Marie Nsahlai as the corporate secretary for Papillon Air, but it appears it was created by Kindambu, and no one who said she ever saw it or even knew about it before she prepared the employee spreadsheets or the loans were granted.

she been allowed to testify, to explain why she did not act, as the court's instructed – with "reckless disregard" of the truth (JA878), then her testimony would have been consistent with the statements she made to Kindambu's daughter on the surreptitious tape recording about Kindambu's psychological and physical abuse and how she, nonetheless, still respected him and kept his abuse a secret. (GX11-2 at 1555,1847).

The surreptitious tape recording, made by Kindambu's daughter to give to the prosecution (JA479), was placed in evidence as GX11-2 (JA vol.3); however, all of it was not played for the jury because of the ruling that the defense could not present evidence of Kindambu's physically and psychologically abusive relationship with Appellant which resulted in him dominating and controlling her. (JA442). Only a few select snippets were given to the jury which were intended to incriminate her. (JA922; JA923; JA924; JA925). That tape recording, made without Appellant's awareness, describes Kindambu's abusive relationship with her. (JA457; GX11-2). The following are statements about her abuse from that tape. (GX11-2). A statement followed by (000) represents its location on the recording's calibrated timer. The statements on GX11-2 are as follows:

- 18 -

Your dad is controlling (211)

He has split ways of behaving (236)

He did not put me on the floor – he pushed me and he choked me (334)

Dad has slapped me before – pushed me – shoved me (404)

Threatened me that he would rip up my stomach (408)

He speaks nasty to me and I don't say anything (408)

He wants to dominate me to the point of abuse (508)

He has done a lot you do not know (510)

Dad talks nasty to me 90% of the time (1115)

I respected your dad to the point where he thought he could order me around (1148)

I have a right to a protective order but did not get it (1435)
        [Loudoun County Juvenile and Domestic Relations Court]

He said certain things that now the court knows I was in bondage (1518) [2]

I've spoken to nobody.  Nobody knows.  My sister does not know (1555)

---

[2] It should also be noted that at the time this recording was secretly made, Kindambu was under prosecution in Loudoun County for having choked Appellant.  There were no charges brought from the other prior incidents of violence revealed in the tape.

- 19 -

He was the one who started throwing things (1837)

I said nothing; I told the neighbors nothing (1847)

I was in a bad situation (1850)

I have said nothing to keep your dad down (1900)

I have taken care of your dad like no other person (1937)

Had the jury been allowed to hear the surreptitious tape recording, they would have heard evidence of an abusive relationship. Had the defense been allowed to present evidence of the abusive relationship Kindambu had created with Appellant, then she could have testified, consistent with this tape, and told the jury about his physical and psychological abuse. She could have explained why – despite the inferences – she did not question him. She was not reckless nor indifferent to the truth; she had a good reason not to question Kindambu.

The defense also sought to introduce Kindambu's resume (JA966-971), which showed what Appellant knew about him when they married in December 2019. (JA429, JA430). That resume states he launched Papillon Air with over 1.5 million in investment from other sources, completely unrelated to the PPP loan. (JA966). It claims he later

increased that investment to 2.5 million non-PPP dollars.  (JA966).
Kindambu had also been involved with Congo Express Airlines in Africa
and helped generate 17 million dollars in domestic passenger business
and managed a staff of 300 employees across 3 countries.  (JA967).  He
partnered with South Africa Airlines and other aviation service
companies to source pilots to be available for Congo Express operations.
(JA967).  He was involved in Rwanda's "Visa Free Africa" 73% increase
in trade with the Democratic Republic of the Congo.  (JA968).  The court
would not allow this exhibit which contains his claims about himself,
which was admissible regardless of its truth.  (JA429-430).

His access to large sums of money and his international business
status was further established by the fact that, of the five cell phones he
had when arrested for this case, three of them were for international
business.  One phone was dedicated solely to Africa, another to Europe,
and a third to the Middle East.  (JA454).

Agent Sublett acknowledged that Kindambu received large
amounts of money wired from overseas into his bank accounts well
before the PPP loans.  (JA666).  In 2019, before the 2020 Pandemic and

PPP loans, Kindambu had close to five million dollars moving around in his accounts from international business. (JA667). He moved half a million dollars in and out of his accounts well before the loans. (JA672). The resume (JA966-971), should have been admitted into evidence, but even were it properly excluded, the information it contained, like the testimony of government witnesses regarding Kindambu's known international business and significant financial activity, could have been included in Appellant's testimony about what she knew if she had been allowed to explain why she did not question his activities.

## VI.   Failure to Give the Jury Proper Instruction on the Law.

### A.    Abused – Unquestioning – No *Mens Rea.*

As previously indicated, prior to the commencement of evidence in the case, the defense asked to be allowed to present evidence, and, per force, instruction at the close of the evidence, that Appellant was a victim of domestic abuse which explained why she did not question things that her husband had her do. She did not want to look into things or, as her lawyer said, "push the envelope", because she did not want to suffer the consequences. (JA98-102).

- 22 -

The court would allow the evidence of abuse if used for a defense of duress, where she would be required to admit she committed the crime, and then claim that she had to do it because there was no alternative due to a genuinely real, imminent threat that Kindambu would kill her or cause serious bodily injury if she did not, but that was not the defense. Those were not the facts. The defense was to be based on the existing facts of her being an abused woman, who, as a result, went along with her abuser husband unquestioningly. (JA98-102). The jury was not allowed to consider the defense theory of the case and give it the weight they thought appropriate. At the end of the case, just before closing argument, the defense was ordered not to mention anything about the abusive, domineering, and controlling relationship, and not to use any words which would in any way describe such a relationship and its effect. (JA837).

The exclusion of the defense evidence meant that there was no jury instruction to explain how the defense negated *mens rea* – scienter.

## B.   Failure to Properly Instruct on Conspiracy.

The conspiracy to commit bank fraud charged in Count 1 related

- 23 -

to the two substantive bank fraud offenses in Counts 2 and 3. (JA25-38).  All are specific intent crimes.

A proposed defense instruction on the requirement that the government prove, for the conspiracy in Count 1, that someone found, beyond a reasonable doubt, to be a co-conspirator must have committed at least one charged overt act in furtherance of the conspiracy was denied.  (JA587, JA588).  In the instruction which was given, the court invaded the province of the jury by telling them that "… evidence has been received in this case or certain persons who are alleged in Count 1 of the indictment to be co-conspirators have done or said things during the existence or life of the alleged conspiracy in order to further advance its goals."  (JA867).  The court instructed that the required overt acts had been proved and only omitted by whom.

The 13 May 2020 transaction in Count 4 was, allegedly, from the 6 May 2020 disbursement of the Papillon Air loan.  (JA35; JA39).  The 28 May 2020 transaction in Count 5 was after both loans had been dispensed.  (JA35; JA39).  Neither Count 4 nor 5 alleged that the transactions were in furtherance of Counts 1, 2, or 3.  These two counts

- 24 -

only adopt paragraphs 1-8 of the indictment which described the PPP

loan program (JA25-27) that Rose-Marie Nsahlai lived in Virginia as

did Kindambu (JA25) and Kindambu as the major controller of the two

companies.  (JA25-26).

When instructing the jury on Count 1, the court told them that the

conspiracy's "purpose" ... "was … to obtain money, funds, … by means of

materially false and fraudulent … representations, … in violation of 18

U.S.C.§1349." (JA870).  The jury was also instructed that a finding that

Appellant was "guilty of conspiracy … as charged in Count 1 …"

allowed them to find her guilty of Counts 2 through 5 – which includes

4 and 5 – money laundering after obtaining the loans which had been

the goal or objective of the Count 1 conspiracy.  (JA869).  They were told

they were allowed to find, if they chose, that Counts 4 and 5 were in

furtherance of the conspiracy to obtain the loans even though done after

the loans had been obtained and despite the fact that the Grand Jury

had not charged 18 U.S.C. §1957 as part of the Count 1 conspiracy in

the indictment.

There was no objection to the erroneous instruction on liability for

Counts 4 and 5 based on being a member of the conspiracy charged in

- 25 -

Count 1, nor that the indictment did not charge, in Count 1, a conspiracy that was related to Counts 4 and 5.

Appellant's due process rights were denied.

## SUMMARY OF THE ARGUMENT

The indictment charged a bank fraud conspiracy, and two substantive counts where Appellant helped her abusive, controlling, domineering husband with payroll records for PPP loans for his two companies. They were recently married, but had not moved in together. She had an explanation for why she did not know he had no employees, but the court, misapplying duress and relevance, did not allow it, so the jury did not know about it.

Her defense to the *mens rea* element – knowledge of no employees – applied to all counts of the indictment. She did not question her abusive, domineering, new husband because of the abusive control he exercised over her. The prosecution would put him in front of the trial jury. There was only circumstantial evidence of her involvement making exclusion of her defense even more significant.

The jury should have been allowed to consider defense evidence of her mental state explaining her actions because of his abuse, and then given it the weight they considered appropriate.

The instructions improperly allowed conviction on Counts 4 and 5 involving the alleged proceeds of the loan based on conviction of a Count 1 conspiracy whose purpose was to obtain the loans. The loans were obtained before the conduct alleged in Counts 4 and 5. The indictment did not charge Counts 4 and 5 as part of Count 1. The count amended the indictment in violation of the Fifth Amendment.

Appellant is entitled to a new trial.

## ARGUMENT

### I.    Rose-Marie Nsahlai Was Denied the Right To Defend.

#### A.    This Indictment Required Proof of Specific Intent for Each Offense, i.e. Knowledge of No Employees.

Bank fraud, charged in Counts 1, 2, and 3, is a specific intent crime requiring proof of knowledge that the representations regarding employees for the PPP loans were false when made. *United States v. Whaley*, 786 F.2d 1229, 1231 (4thCir. 1986). *Whaley* was prosecuted

under 18 U.S.C.§1014 regarding fraudulent statements to a bank to support a loan; however, in *United States v. Bales*, 813 F.2d 1289, 1293 (4thCir. 1997), this Court made it clear that the knowingly making false representations element for 18 U.S.C. §1014 is the same as for 18 U.S.C.§1344, charged in this case. A defendant must be proved to know that a statement to influence a PPP bank loan (there are employees) is false when made. *Id.* See also, *South Atlantic Limited Partnership of Tennessee v. Riese,* 284 F.3d 318 (4thCir. 2002). If a jury finds that a defendant, in a fraud case, believed the information provided was true, then that is a complete defense. *Id.* at 531, citing *United States v. Godwin*, 272 F.3d 659, 666 (4thCir. 2001). Proof of knowledge of the falsehood *mens rea* is key to proving the required specific intent for Counts 1, 2, and 3.

Money laundering, with proceeds of a crime, is also a specific intent crime. Counts 4 and 5, charged conducting a financial transaction with the proceeds of the fraudulent PPP loans. (JA39). Those two counts required proof of knowledge that the funds used in the financial transactions were the proceeds of what was known to be a

- 28 -

fraud. *United States v. Gilliam*, 975 F.2d 1050, 1056 (4thCir. 1992).

See also, *United States v. Godwin, supra*, at 669. As elements, those

facts had to be proved beyond a reasonable doubt. *In Re Winship*, 397

U.S. 358 (1976). The prosecution had to prove that Appellant actually

knew or acted with reckless indifference to whether there were

employees for Counts 1, 2, and 3. If she did not have the required

knowledge about the employees for Counts 1, 2, and 3, then she lacked

the required *mens rea,* i.e., knowledge for specific intent for Counts 4

and 5 that the transactions were with the proceeds of fraud. If she did

not know there was a fraud, then she did not know the transactions

involved the proceeds of fraud. Exclusion of defense evidence about why

she did not know – her state of mind – applied to all counts.

*Mens rea*, is defined as a "state of mind" which, if proved to be a

guilty state of mind, can lead to a conviction. Black's Law Dictionary,

7th Edition at 999. *Mens rea* is essentially the same as "scienter", which

is defined as the degree of knowledge that makes a person legally

responsible for their acts. *Id.* at 1347. As already noted, the court

instructed the jury that Appellant's state of mind, what she knew or did

not know about employees, was a matter for them to decide, and they could use circumstantial evidence presented by the prosecution in making that decision. (JA856). They were also instructed that, when deciding whether she had knowledge, they could consider whether she acted with "reckless indifference". (JA878). The excluded evidence directly addressed that issue. It was relevant and its admission was consistent with her due process right to defend. Its exclusion denied her right to defend.

If her status as an abused woman had not been erroneously kept from the jury, then they could have decided for themselves what weight to give it in determining whether there was a reasonable doubt about *mens rea* regarding knowledge of no employees at the time the spreadsheets were provided for the loan applications. The jury was not allowed to make its decision fully informed of all the admissible facts.[3]

---

[3] A key reason her probative evidence was excluded was the court's misunderstanding of the law on the defense of duress coupled with its resultant misapplication of the law pertaining to the low bar for relevance.

Where a court dilutes the right to defend by not allowing the jury to consider and make a decision based on evidence from the defense, including the defendant, about the state of mind of the accused, as occurred here, that is a fundamental denial of due process.

## B.    Misapplication of Law on Duress.

### 1.    Standard of Review.

Errors of law such as denying the right to defend, including the right to testify in one's own defense about one's state of mind when one acted and misapplication of the law are reviewed de novo. *Cullins v. Pond Creek Mining Company*, 468 F.3d 213, 217 (4thCir. 2006); *Milburn Collery Co. v. Hicks*, 138 F.3d 524, 528 (4th Cir. 1998). Even under an abuse of discretion standard, errors of law constitute an abuse of discretion. *United States v. Muslim*, 944 F.3d 154, 162 (4thCir. 2019).

### 2.    Misunderstanding the Law of Duress.

The court did not understand the defense of duress resulting in the erroneous exclusion of the defense evidence about how her abusive relationship affected her when it came to questioning her husband. The

court would allow that evidence but only if she made a duress defense
Duress did not apply.

Duress requires an admission of guilt: I did it; but I had to
because of imminent fear of death or serious bodily harm. *United
States v. Bailey*, 444 U.S. 394 (1980) explains that duress excuses
criminal conduct done because of imminent threat of death or serious
bodily harm. *Id.* at 409, 410. It is the imminence of the threatened
death or bodily harm with no way out which makes the violation the
only choice. *Id.*

Appellant did not face an imminent threat that if she did not
compile the employee spreadsheets Kindambu would kill her or attach
with such violence he would cause serious bodily injury. Duress would
not apply. She was, as the statements in the surreptitious recording
establish, in an abusive relationship. (GX11-2). Kindambu verbally
and physically assaulted her, hit her, pushed her, and dominated her in
a controlling, abusive relationship. (Infra at 19,20). The result was
that she did not question him about the loan applications.

The trial court erroneously believed that the evidence of
Kindambu's abusive relationship with Appellant was admissible for the

- 32 -

defense of duress; duress did not apply under the facts but the court did not know that. (JA99-102). There was evidence of abuse, but not of duress. The abuse evidence was not an imminent fear of death or serious bodily injury, harm or else. It was control and domination resulting in unquestioning compliance with Kindambu's requests. The court failed to understand the distinction. (JA98-102). That failure is shown by the fact that the evidence of the controlling, abusive relationship without imminent fear of death or serious bodily injury would be allowed if the defense was duress. (JA100-102). The result of that failure to understand was the wrongful exclusion of the defense evidence negating *mens rea*, scienter. Evidence she did not know and why she did not ask negated the claim of knowledge and that she acted with reckless indifference. Her state of mind had an explanation which the jury should have been allowed to consider.

## C.    The Right to Defend.

Appellant was entitled to her evidence of lack of knowledge and no reckless indifference. The circumstantial evidence of her knowledge on the subject of employees could be viewed either as she did or as she did

not have actual knowledge, so the court instructed the jury that they could also find she had the required knowledge if they found she acted with "reckless indifference" to whether he had employees.  (JA878).  The court, however, erroneously, would not allow her to present evidence that she did not know there were no employees and did not act with "reckless indifference" because she did not question him due to an abusive relationship with that man who physically and psychologically abused her and controlled and dominated her.  (JA99-012).  As an abused woman, she did not question him.  (JA587; JA837).  That should not have been kept from the jury.  How to view her evidence about why she acted as she did was their call, but they did not get the chance.

The exclusion of her defense that negated *mens rea,* lack of knowledge, resulted in denial of her right to testify as part of the fundamental right to defend.  She could not testify if she could not explain herself and why she did not ask questions which someone else in a different situation might ask.  She could not testify in the confines of the court's limitations.  The jury would want to know - why didn't you ask – and she was prohibited from answering.

- 34 -

In *Rock v. Arkansas*, 483 U.S. 44 (1987), the trial court limited the

defendant's testimony on her own behalf; that constituted a mistake of

law.

> "Logically included in the accused's right to call witnesses
> whose testimony is 'material and favorable to his defense',
> [cite omitted] is the right to testify himself, should he decide
> it is in his favor to do so.  In fact, the most important witness
> for the defense in many criminal cases is the defendant
> himself.  No justification today for a rule that denies an
> accused the opportunity to offer his own testimony.  The
> truthfulness of other witnesses, the defendant's veracity,
> which was the concern behind the original common-law rule,
> can be tested adequately by cross-examination."

*Id.* at 52.

An opportunity to testify is also a necessary corollary to the Fifth

Amendment guarantee against compelled testimony.  *Id.*  It is a

defendant's choice and courts which, as here, interfere with that right,

commit error.  If a defendant is not allowed to explain to the jury the

basis for their unquestioning lack of knowledge in a case, such as this,

where their knowledge is the core of the prosecution, they are effectively

denied their fundamental right to defend and their fundamental right

to testify in their own behalf.  That is an abuse of discretion and a

mistake of law.  The mistake of law in this case includes the lack of understanding of the law of duress.

The right to defend is fundamental in our adversary system.  *In Re Oliver*, 333 U.S. 257 (1948).  As the Supreme Court held in that case, "… an opportunity to be heard in his [her] defense – a right to his [her] day in court – are basic in our system of jurisprudence; and these rights include, as a minimum, a right to examine the witnesses against him [her], to offer testimony [evidence], and to be represented by counsel."  *Id.* at 273.

> "The right to offer testimony of witnesses and to compel their attendance, if necessary, is in plain terms the right to examine the defense, the right to present the defendant's version of the facts as well as the prosecution's to the jury so that it may decide where the proof lies.  Just as the accused has the right to confront the prosecution's witnesses for the purpose of challenging their testimony, he has the right to present his own witnesses [evidence] to establish a defense.  This right is a fundamental element of the due process of law."

*Washington v. Texas*, 388 U.S. 14 (1967).

Excluding the right to explain one's unquestioning compliance denies the right to testify and the right to defend.  That is a fundamental denial of due process.

- 36 -

The law recognizes lack of knowledge as a defense and that it can come from a failure to ask questions. If the defense had been allowed to present to the jury Appellant's status as an abused woman which put her in a situation where she was not questioning her abuser, then the government has a well-recognized counter they could offer to her lack of knowledge which the jury would also have been allowed to consider. The counter is called "willful blindness". A recent case in this Circuit, *United States v. Ravenell*, ___ F.3d __ 224369 (4thCir. 2023) (April 25,2023) had a willful blindness component. It did not apply there because, unlike here, in that case, the government had its cooperators present direct evidence on the subject of that defendant's knowledge. *Id.* at Slip op. 30, 31. Nonetheless, that case is instructive because that defendant was not prohibited from arguing his case and the court let the jury decide about his knowledge by giving the willful blindness instruction without hog tying the defense as occurred here.

In *United States v. Farrell,* 921 F.3d 116 (4thCir. 2019) this Court made clear that in a case, money laundering there, where, as here, knowledge is a required element, the government is entitled to a willful

- 37 -

blindness instruction when the defense relies on the well-recognized lack of knowledge defense so that the jury is allowed to consider whether the accused deliberately made themselves ignorant of the fact which are required to be proved as knowledge for conviction. In that case, the issue was willful blindness about whether the funds in a money laundering charge were the proceeds of an unlawful activity. *Id*. at 145. The instruction in *Farrell* on willful blindness told the jury that if the defendant acted with a conscious purpose to avoid learning the truth, with deliberate disregard for the facts, then they could find that he acted knowingly. *Id*. at 133, 134. In this case, the court also gave such an instruction but, unlike in *Farrell*, the defense here was not allowed to present its evidence on the question of knowledge. Both sides in Appellant's case could not argue and the jury could not consider her reasons for the lack of knowledge and failure to question. Only the prosecution could present evidence on that question.

### D.    Evidence Negating Specific Intent Is Relevant.

The court failed to appreciate this Court's prior holdings on Relevance.

- 38 -

### 1.    Standard of Review.

Relevance is considered in terms of abuse of discretion, and a court abuses its discretion when it makes an error of law.  *United States v. Muslim*, 944 F.3d 154, 162 (4thCir. 2019).

A district court abuses its discretion when, as here, it fails to consider judicially recognized factors constraining its exercise of discretion, relies on erroneous legal premises, or commits an error of law.

Relevance presents a low barrier to the admissibility of evidence. Indeed, to be admissible under Rule 401 F.R.Evid., evidence need only be worth consideration by the jury or have a plus value.  *United States v. Hedgepeth*, 418 F 3d 411, 419 (4thCir. 2005); *United States v. Leftenant,* 341 F.3d 338, 346 (4thCir. 2003).

### 2.    Appellant's State of Mind Was Relevant to Her Knowledge.

The court's refusal to allow the defense to raise a reasonable doubt about Appellant's knowledge because she did not know about Kindambu's companies' employees and she did not question him as a consequence of his abusive relationship and his dominance and control over her was an error of law based on a mistake of law regarding

- 39 -

duress; however, the court spoke about its denial in terms of relevance. It erroneously found that her abuse and its consequences were not relevant to her lack of knowledge or whether she acted with reckless indifference. (JA101; JA485; JA887). The abuse affected her state of mind. Knowledge and intent are a state of mind. The instruction on reckless indifference also made her state of mind caused by his abuse, relevant.

In *United States v. Queen*, 132 F.3d 991 (4thCir. 1997), this Court accepted, with approval, Professor Wigmore's definition of relevance. Professor Wigmore described relevance as follows:

> "The evidentiary fact offered does not need to have strong, full, superlative, and probative value and does not to involve demonstration or to produce persuasion by its sole and intrinsic force but merely needs to be worth consideration by the jury. It is for the jury to give the fact the appropriate weight in effecting persuasion."

*Id.* at 998.

The excluded evidence about the abusive, controlling relationship and its effect on her actions was relevant under Rule 401 F.R.Evid. It tended to prove whether she lacked the required specific intent in that she did not know and did not question Kindambu about his employees

because of their relationship. Even if circumstances would have raised questions for the average person, she did not question. Her state of mind was different and there was a reason for it. Her failure to question was relevant, as was the reason she failed to question. That excluded evidence explaining why she was not "recklessly indifferent" was worth consideration by the jury. *United States v. Queen, supra.* For that reason, it is relevant. The court erroneously excluded relevant evidence explaining her state of mind. It ignored the fact that relevance is a low bar and that it was probative of a contested issue.

The court agreed that the intent of a person or the knowledge they possess at a given time was relevant and may not ordinarily be proved by direct evidence, there is no way of directly scrutinizing the workings of the human mind, and, that the jury could consider circumstantial evidence. (JA876). It erroneously allowed only one side – the prosecution – to present evidence on that relevant fact.

Circumstantial evidence, as the court instructed, is a chain of facts and circumstances indicating the existence of a fact, and inferences are simply deductions or conclusions reasoned in common sense to lead the jury to draw from the evidence received in the case.

- 41 -

(JA856). How the jury viewed the evidence was, of course, up to them. In order for the jury to properly weigh the evidence on Appellant's state of mind, what she did or did not know and why – she was entitled to explain her state of mind at the time and why. They could then give the evidence whatever weight they thought appropriate.

In this case, the prosecution presented its circumstantial evidence on her state of mind. The defense should also have been allowed to present its evidence on her state of mind explaining why she did not know. Allowing this defense evidence would have been consistent with the fundamental right to defend – her right to her day in court. Excluding defense evidence about her state of mind was based on errors of law as well as an abuse of discretion.

### E.    It Was Up to the Jury to Decide Whether Being An Abused Woman Negated *Mens Rea*.

#### 1.    *Mens Rea* Is Affected By Abuse.

Being physically and psychologically abused for a period of time clearly creates stress in the victim of the abuse. It is commonly understood that stress creates changes in one's mental status. A "stressor" is defined in the <u>Diagnostic and Statistical Manual</u> – <u>Fifth</u>

- 42 -

Edition, American Psychological Association, to include an emotional or physical factor that disrupts the normal physiological, cognitive, emotional, or behavioral balance of an individual.  DSM-V, at 829.  Being hit, shoved, threatened to have one's stomach ripped out, and being subjected to nasty verbal abuse 90% of the time is a stressor.  (Infra. at 18, 19).  It is physical and psychological abuse.

According to the Centers for Disease Control and Prevention and the National Institute of Justice Report, *Extent, Nature, and Consequence of Intimate Partner Violence* released in July 2000, one in four women in the United States have experienced domestic violence.  It was psychologist Leonora Walker who first published about battered women in 1979.  She collected and analyzed information about abused women.  According to her article, *The Battered Woman Syndrome,* New York:  Springer; 1984, at 203, a battered woman is 18 years of age or older, has been in an intimate relationship with a man who repeatedly subjects her to physical and/or psychological abuse.  Nearly forty (40) years ago it was recognized that the consequence of this physical and psychological abuse can be cognitive and behavioral deficits.

The abuse in this case is clear. In the surreptitious recording Kindambu's daughter made of Appellant (GX-11-2), she informs the daughter that her dad is controlling (211); has split ways of behaving (236); has put her on the floor, pushed her, choked her, slapped her, and shoved her (404); he even threatened to rip her stomach out of her body (408). Kindambu speaks to her in a nasty way and wants to dominate her to the point of abuse and has done a lot that the daughter does not know. (408, 508, 510). He subjects her to verbal abuse 90% of the time. (1115). She was, essentially, in bondage. (518). At the time of that surreptitious recording, he had been charged by the Loudoun County Sheriff's Department with choking Appellant. She would not seek a protective order to keep him away from her (1435) and spoke to no one about the abuse. (1555, 1847). She spoke to no one, no one knew. Even her sister did not know and she told nothing to the neighbors. (1555, 1847). Appellant took care of Kindambu like no other person. (1937). She was abused, kept it a secret, and did not leave the relationship, (Infra. at 18, 19), which unfortunately is typical of abused women controlled and dominated by their abusers.

- 44 -

Other factors establishing his domination and control over her included the fact that they were married in December 2019 after dating for only a couple of months, yet they did not live together. (JA465, JA468). In December 2019, he had her suddenly up and leave her family to go to Congo for him when they had not been together since her husband of 17 years died and her son was ill; she did not even tell her family they were married. (JA784-788). She just up and left. That was out of character for her. (JA786-788). He also would not tell her family they were married. (JA789).

In *Intimate Partner Violence*, published in <u>Medical News Today</u>, by Zawn Villines, updated in August 2022, and medically reviewed by Janet Brito, PhD., LCSW, CST, it notes that women in these abusive relationships often do not feel able to leave and that their feelings of helplessness can be caused by many things. *Id.* at 1. Those involved in these relationships are trapped in them. *Id.* at 1. Being educated or financially stable does not make one immune. The victims of abuse come from many different ages and social classes as well as different levels of education. *Id.* at 1. Abuse can include name calling,

- 45 -

humiliation, subversive control, and behaving in a way that aims to control the victim. *Id*. at 3. The victims feel helpless and, as here, deny anything is wrong. Abuse victims often excuse their abuser, refusing to leave, and idealize the individual who carried out the abuse. *Id*. at 3.

Thirty-two years ago, prior to the current level of knowledge and the wider exposure to the victimization of women by the #Me Too Movement, the Ninth Circuit, in *United States v. Johnson*, 956 F.2d 894 (9thCir.1991), addressed the fact of how abused women can react to their abuser when in such a relationship. That case was in the context of sentencing. It recognized that a battered or abused woman holds a negative belief about the effectiveness of her actions which results in a learned helplessness that prevents her from leaving the abuser. *Id*. at 899. This condition was so well recognized, even then, that the Court recognized that the majority of states recognized the condition of being an abused woman as a defense for crimes of violence against their abuser. *Id*. at 900.

The first federal appellate case on this issue was *Arcoran v. United States,* 929 F.2d 1235 (8thCir.1991), *cert. denied*. 116 Law

Ed.2d 255, 112 S.Ct. 312 (1991). In that twenty-two (22) year old case, federal prosecutors sought to explain the change in a key witness's testimony by explaining how battered women react to their abusers. It cited to the Model Penal Code of 1991, which recognized that abused women can become submissive to whatever suggestions their abusers may make. *Id*. Being an abused woman, such as Appellant, is relevant and admissible to explain why Appellant did not know and did not ask about her abusive husband's employees.

Women who are subject to abuse live in a fearful environment which makes them submissive to their abusers. There may not be an imminent threat of death or serious bodily harm, but that does not mean they are not abused and, because of learned helplessness they can develop unquestioning submissiveness. *United States v. Johnson, supra*, at 899. People today are more aware of abused women then they were when *Johnson* was decided in 1991. In Washington, DC, for example, if one Google's "battered women shelters" in DC, one can find a list of the top ten. A similar search discloses that there are seven in the City of Alexandria area. The existence of these known shelters is

- 47 -

further proof of the more common awareness of the existence of this unfortunate condition than there was in the 1990's.

In 1995, the district court for the District of Maine in *United States v. Marenghi*, 893 F.Supp. 85 (D.C. Maine 1995), was faced with the question of whether Battered Women Syndrome could be a defense to *mens rea*. The case involved a conspiracy to possess and distribute a controlled substance where the defense wanted to present Battered Women Syndrome as a defense to the *mens rea* element, i.e., that she, because of being a battered woman, lacked the specific intent necessary to form the *mens rea* required to establish guilt. That court, 28 years ago, found that "… The evidence is admissible for the purpose of directly negating any evidence presented by the Government to the effect that the Defendant knowingly and intentionally performed in the criminal actions alleged in the indictment." *Id.* at 90. Evidence that negates the presence of *mens rea* is not an affirmative defense; it merely negates an element of the offense itself. *Id.* at 89. (Citing cases from various circuits). That 1995 decision was in an environment less informed than we have today, nonetheless, the court allowed the defense the ability to present the defendant's abuse defense to the

- 48 -

element of *mens rea*, i.e., her intent to commit the offense with which she was charged.  The same should apply here.

The impact of public awareness of the fact of abused women in this case is that jurors, who do not leave their common sense and experience at home (JA854), should have been allowed to decide the impact of this abusive relationship on Appellant's unquestioning relationship with Kindambu in 2020 when the events giving rise to this case occurred.  Her state of mind – her knowledge – and whether she was, as the court said, recklessly indifferent, was their decision.  They should have been allowed to make that decision informed of all the facts from both sides but they were not.

## II.    Erroneous Instruction on Count 1's Relationship to Counts    4 and 5 Also Violated the Fifth Amendment Right to an    Indictment.

### A.    Standard of Review.

Amending an indictment is contrary to the Fifth Amendment. *United States v. Wells*, 519 U.S. 482, 500 (1997).  Errors in instructions are viewed for an abuse of indiscretion.  *United States v. Russell*, 971 F.2d 1098, 1107 (4thCir. 1992).

- 49 -

**B.    The Right to an Indictment Which Provides Notice.**

It is axiomatic that the Fifth Amendment to the United States Constitution guarantees that an accused may not be brought to trial on a felony except by an indictment returned by a grand jury unless the right to indictment is waived.  There was no waiver here.  The grand jury returned the indictment in this case.  Count 1 charged conspiracy to commit bank fraud in violation of 18 U.S.C.§1349, which makes it an offense to conspire to commit offenses in Chapter 63 of the United States Code regarding fraud.

Count 1, as returned by the grand jury, did not mention money laundering nor any money laundering conduct or statute.  (JA25-36). Money laundering, in violation of 18 U.S.C. §1957, was specifically charged only in Counts 4 and 5. (JA39).  It is not an offense in Chapter 63.

The goal and objective of the conspiracy in Count 1, according to the court's instruction to the jury, was "… to obtain money, funds … by means of … fraudulent representations." (JA870).  The indictment was not given to the jury.  (JA795).  The loans were obtained and the funds

- 50 -

dispersed before the 13 May 2020 transaction alleged in Count 4 and before the 29 May 2020 transaction alleged in Count 5. (JA35). Neither Count 4 nor Count 5 adopted any of the allegations in the conspiracy alleged in Count 1 nor any of the allegations in Counts 2 or 3, the substantive bank fraud charges. (JA39). Those Counts, 4 and 5, were charged as stand-alone violations of 18 U.S.C. §1957. (JA39).

A conspiracy under 18 U.S.C. §1349 is an agreement to commit a fraud made unlawful by Chapter 63 of the United States Code. Such a conspiracy must, therefore, be an agreement to commit the underlying crime and all of its elements. *Ocasio v. United States*, 578 U.S. 282, 287, 288 (2016). The conspiracy here, however, did not charge an intent to commit the underlying crime of money laundering in violation of 18 U.S.C. §1957. That failure denied Appellant of her right to notice of what she must defend, which is the guarantee of the Fifth Amendment. See, e.g., *Ring v. Arizona*, 536 U.S. 584 (2002), where the Court made it clear that the Due Process Clause and the related notice requirement require that facts which affect the maximum penalty for a crime must be charged in the indictment. *Id.* at 600. In this case, that requirement

would, according to the court's instruction that conviction of Count 1 could justify conviction of Counts 4 and 5, mean that Count 1 would have to have charged, contrary to the court's instruction, as an objective of the conspiracy, and agreement to violate 18 U.S.C. §1957.  Count 1, like the court's instruction, made no such charge.  It gave no notice that §1957 was alleged to be part of the agreement for the conspiracy.

An accused is entitled to notice of the charges they are called upon to defend and the concomitant opportunity to prepare their defense to defend against them.  That is the *sine qua non* of our criminal law system.  *Groppi v. Leslie*, 404 U.S. 496 (1972).  In that case, Father Groppi was charged with contempt of the Wisconsin Assembly and sentenced without notice or an opportunity to be heard.  The Supreme Court stated that "… there can be no doubt that the minimum required by due process before the depravation of life, liberty, or property by adjudication is the requirement of notice and an opportunity to be heard."  *Id.* at 502, 503, citing *Mullane v. Central Hanover Trust Co.*, 339 U.S. 306 (1950).

Under Rule 7(c) F.R.Crim.P., the indictment informs the accused in a plain, concise, and definite written statement of the essential facts constituting the events charged and for which they are going to be placed on trial. That satisfies the notice requirement under *Groppi v. Leslie, supra,* and permits the defendant to defend themselves in court so that, as the Court held in *In Re Oliver, supra*, they can exercise their right to defend and have their day in court. The conspiracy in Count 1 did not provide notice that Counts 4 and 5 were part of that charge. No facts of what was allegedly done to commit Count 1 referenced money laundering. (JA25-38). Since all facts or ingredients of the charged offense must be found by the trial jury beyond a reasonable doubt, according to *United States v. O'Brien,* 560 U.S. 218, 224 (2010), the Fifth Amendment right to an indictment requires that it include every fact that is the basis for imposing punishment. *Alleyne v. United States*, 570 U.S. 99, 109 (2013). The indictment returned by the grand jury did not have, as an ingredient in the conspiracy charged in Count 1, the money laundering charges - 18 U.S.C.§1957 - alleged in Counts 4 and 5. There was no notice that Appellant had to defend Counts 4 and

- 53 -

5 when defending Count 1. That is even more clear from the court's instruction, before closing argument, that the purpose or object of the conspiracy was to obtain money by fraud. (JA870). That instruction, allowing conviction of Counts 4 and 5 if the jury convicted of Count 1, was an abuse of discretion and an error of law. That defacto amended the indictment.

As a general proposition, it is reasonable that the jury considered the counts in the order in which they were charged in the indictment. The first count in the indictment was the conspiracy to obtain the loans. Next were the substantive charges of fraudulently obtaining the loans in Counts 2 and 3. Counts 4 and 5 came after. Since the court told the jury that if the defendant was found guilty of Count 1, then she could also be convicted of all of the other counts, it is presumptive that they took the counts in order. (JA869). All the jury had were the court's instructions. The indictment did not go into the jury room. (JA795).

Appellant was entitled to notice that she was thus charged in the indictment, but it is not there. Rule 7(c) F.R.Crim.P. requires compliance with the Fifth Amendment by requiring an indictment to have a plain, concise, definite statement of the facts making such an

allegation.  The court impermissibly amended the indictment in its instructions to the jury about conviction of Count 1 allowing conviction of Counts 4 and 5 which violated the Fifth Amendment right to be tried on the indictment returned by the grand jury.  See, e.g., *United States v. Wells, supra.*

### C. Erroneous Instruction on Count 1's Relation to Counts 4 and 5.

The erroneous jury instruction allowed the jury to consider conviction on a basis not charged in the indictment and based on facts that were not consistent with the court's instruction that the goal of the conspiracy in Count 1 was to obtain the loans.  This problem is exemplified by the fact that, if the goal of the conspiracy, as instructed by the court, was to obtain money by false representations – bank fraud -- then conduct, after the money was obtained, could not be in furtherance of obtaining that money, yet that is what the court told the jury they could consider.  (JA869, JA870).  That instruction runs afoul of a district court's obligation to correctly instruct the jury on an offense and its elements whether requested or not.  *United States v. Hutchinson*, 388 F.3d 991 (4thCir. 1964); *United States v. Head*, 641

F.2d 174, 180 (4thCir. 1981).  See also, *United States v. Polowichak*, 783 F.2d 410, 415 (4thCir. 1986).  The instructions for Count 1 impermissibly connect it to Counts 4 and 5.

The purpose of jury instructions is to clearly and succinctly inform the jury of the essential issues in the trial, the role they are to play, and the decisions they must make.  *United States v. Lewis*, 53 F.3d 29, 34 (4thCir. 1995).  That did not happen here.  The instructions amended the indictment, were clearly erroneous, violated fundamental rights, and had an undue and improper impact on the verdict.

## CONCLUSION

Appellant was entitled to be tried on the indictment returned by the grand jury, to present her evidence explaining what she did and why, and to have the jury clearly instructed on the applicable law so that they can weigh the evidence and decide.  She is entitled to a new trial.

## REQUEST FOR ORAL ARGUMENT

Appellant respectfully requests oral argument on the issues presented in this appeal.

Respectfully submitted,

ROSE-MARIE NSAHLAI
By Counsel

*/S/ Marvin D. Miller*
MARVIN D. MILLER, ESQ.
Counsel for Rose-Marie Nsahlai
Law Offices of Marvin D. Miller
1203 Duke Street
Alexandria, VA 22314
Phone 703 548-5000
Fax 703 739-0179
ofc@mdmillerlaw.com

## CERTIFICATE OF COMPLIANCE

1.     This Brief of the Appellant has been prepared using Microsoft Word, Century Schoolbook font, 14 point.

2.     Exclusive of the corporate disclosure statement; table of contents; table of authorities; statement with respect to oral argument, any addendum containing statutes, rules, or regulations; and the certificate of service, this brief contains 11,008 words.

*/S/ Marvin D. Miller*
MARVIN D. MILLER

- 57 -

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY, that a copy of the foregoing Opening Brief of Appellant has been electronically filed with the Clerk of Court this 9th day of February 2024, by using the CM/ECF system which will send notice of electronic filing to all parties of record.

I FURTHER CERTIFY, that Joint Appendix Vol. III - Digital Media, has been served electronically on opposing counsel per the agreed method of service.

*/S/ Marvin D. Miller*
MARVIN D. MILLER