IN THE
UNITED STATES COURT OF APPEALS
FOR THE FOURTH CIRCUIT

———————————————

No. 23-4675

———————————————

UNITED STATES OF AMERICA,

*Appellee*,

v.

ROSE-MARIE NSAHLAI,

*Appellant*.

———————————————

Appeal from the United States District Court
for the Eastern District of Virginia
at Alexandria
*The Honorable Rossie D. Alston, Jr., District Judge*

———————————————

BRIEF OF THE UNITED STATES

———————————————

Jessica D. Aber
United States Attorney

Jordan Harvey
Assistant United States Attorney
2100 Jamieson Avenue
Alexandria, Virginia 22314
(703) 299-3700

*Attorneys for the United States of America*

## Table of Contents

**Page**

Table of Authorities ..................................................................... iii

Introduction ............................................................................... 1

Issues Presented........................................................................... 5

Statement of the Case .................................................................. 5

    A.   The district court's evidentiary ruling on the defendant's
         allegations of abuse..................................................... 5

    B.   The jury finds the defendant guilty on all counts. ..........14

Summary of Argument ...............................................................15

Argument ..................................................................................17

I.    The district court correctly excluded domestic abuse testimony and
     evidence. ............................................................................17

    A.   The district court did not abuse its discretion in excluding
         domestic abuse evidence while permitting the defendant to
         testify that she felt compelled by her husband...............17

    B.   Alternatively, the district court's evidentiary ruling did not deny
         the defendant the constitutional right to present a defense...............19

    C.   Even if the district court abused its discretion in excluding the
         evidence, any error was harmless. ...............................22

II.   The district court correctly instructed the jury.......................46

Conclusion.................................................................................52

Statement Regarding Oral Argument ...........................................53

Certificate of Compliance ................................................................. 53

Certificate of Service.......................................................................... 54

# Table of Authorities

Page

**Cases**

*Arizona v. Fulminante*, 499 U.S. 279 (1991)..............................................22, 23

*Crane v. Kentucky*, 476 U.S. 683 (1986).......................................................17

*Delaware v. Van Arsdall*, 475 U.S. 673 (1986).............................................23

*Henderson v. United States*, 568 U.S. 266 (2013)..........................................47

*In re Under Seal*, 749 F.3d 276 (4th Cir. 2014).............................................47

*United States v. Bennett*, 986 F.3d 389 (4th Cir. 2021)..................................47

*United States v. Benton*, 523 F.3d 424 (4th Cir. 2008)...................................47

*United States v. Carthorne*, 726 F.3d 503 (4th Cir. 2013)..............................48

*United States v. Jeffers*, 570 F.3d 557 (4th Cir. 2009)....................................46

*United States v. Kobito*, 994 F.3d 696 (4th Cir. 2021)....................................47

*United States v. Malloy*, 568 F.3d 166 (4th Cir. 2009)...................................17

*United States v. Miller*, 41 F.4th 302 (4th Cir. 2022).....................................46

*United States v. Olano*, 507 U.S. 725 (1993)................................................48

*United States v. Prince–Oyibo*, 320 F.3d 494 (4th Cir. 2003)..........................19

*United States v. Rand*, 835 F.3d 451 (4th Cir. 2016)...........................19, 21, 22

*United States v. Uzenski*, 434 F.3d 690 (4th Cir. 2006)..................................17

*United States v. Williams*, 632 F.3d 129 (4th Cir. 2011)..........................19, 22

*United States v. Zayyad*, 741 F.3d 452 (4th Cir. 2014)..................................47

*United States v. Zelaya*, 908 F.3d 920 (4th Cir. 2018)...................................49

**Statutes**

18 U.S.C. § 1344 ..........................................................................................4

18 U.S.C. § 1349 ..........................................................................................4

18 U.S.C. § 1957 ..........................................................................................4

**Rules**

Fed. R. Crim. P. 30 ........................................................................46

Fed. R. Evid. 401 ..........................................................................15

Fed. R. Evid. 403........................................................... 8, 15, 20

**Introduction**

In early 2020, as the COVID-19 pandemic was threatening the financial stability of American businesses and their employees, Congress passed the Coronavirus Aid, Relief, and Economic Security (CARES) Act in an effort to provide fast and direct financial assistance for American workers and small businesses. One of the assistance programs created by the CARES Act was the Paycheck Protection Program ("PPP"), which offered forgivable loans to small businesses to help them maintain payrolls and rehire laid-off employees. Here, the defendant, Rose-Marie Nsahlai, was convicted on charges of fraud and money laundering because she and her co-conspirator husband fraudulently obtained over $2.5 million in PPP funds.

The U.S. Small Business Administration ("SBA") was the federal agency responsible for administering the PPP, and the SBA created the rules and application materials governing the PPP loans. However, in contrast to other SBA loan programs, some of the administration of the PPP loan process was delegated to private financial institutions. In practice, a prospective applicant seeking a PPP loan would work directly with the private financial institution of their choice (typically their bank) to obtain application materials and apply for the PPP loan. If the application was approved, the bank would provide the PPP loan funds directly to the applicant. PPP loans were guaranteed by the SBA. The first PPP loans

1

became available in April 2020.

Because the PPP's primary purpose was to keep workers employed, the formula for calculating each applicant's maximum possible loan amount was based entirely on that applicant's recent payroll figures. In other words, payroll amount determined PPP loan amount. Specifically, the PPP loan application asked business applicants to report the average monthly payroll ("AMP") that they had paid to employees and independent contractors during calendar year 2019.[1]

According to the rules of the program, that AMP figure could only include the salaries of employees for whom the business paid payroll taxes, as well as any payments made to independent contractors that were reported on IRS Forms-1099. Once calculated, that AMP figure was multiplied by 2.5 in order to determine the maximum possible PPP loan amount that a business could receive.[2] In other words, a larger AMP figure would result in a larger possible PPP loan. It was this aspect of the program that the defendant and her husband, Didier Kindambu, targeted with their fraudulent conduct.

Because the AMP figure determined the maximum possible PPP loan

---

[1] Businesses that were started in 2020 were permitted to calculate their AMP figure using 2020 payroll data.

[2] PPP loans were intended to allow businesses to pay their workers for 2.5 months.

amount, business applicants were required to submit documentation that supported the AMP figure they were reporting. This was typically done by submitting either tax records (i.e., copies of tax documents that the business had submitted to the IRS) or payroll records (i.e., the business's internal records of its payroll payments). Applicants were required to certify that the application (including the AMP figure) and the supporting documentation they were submitting were accurate, and that the applicants understood that "knowingly making a false statement to obtain a guaranteed loan from SBA is punishable under the law." Nevertheless, the defendant conspired with her husband to submit false information in two PPP loan applications, and to fabricate false payroll spreadsheets to support the AMP figures claimed in those applications. By following through with their fraudulent scheme, they unlawfully received $2.5 million in PPP loan funds.

At trial, the government presented voluminous evidence of the defendant's active, assertive, and enthusiastic participation in this criminal conspiracy, including her text messages, her emails, and an audio recording of the defendant discussing her criminal conduct. The government also introduced into evidence documents and testimony showing that the defendant was intimately involved in the two companies she ran with her husband and would have known that the dozens of "employees" and "contractors" that she listed in the payroll spreadsheets

did not work for either company.

A jury convicted the defendant of one count of conspiracy to commit bank fraud, in violation of 18 U.S.C. § 1349, two substantive counts of bank fraud (one for each PPP loan application), in violation of 18 U.S.C. § 1344, and two counts of engaging in monetary transactions using the proceeds of the fraud (i.e., money laundering), in violation of 18 U.S.C. § 1957.

On appeal, the defendant argues that the district court erred in excluding domestic violence evidence purporting to show that fear of her husband's abuse compelled her to help with the PPP applications and also dissuaded her from asking questions about them, thereby preventing her from learning that the applications were fraudulent. But the district court did not err in excluding irrelevant and prejudicial evidence. And far from being an unwilling and unaware pawn in her husband's scheme, the trial evidence demonstrated that the defendant was an active and enthusiastic participant in the plan to defraud Bank of America. Any error is therefore harmless.

The defendant also argues that the district court erred in instructing the jury on the implications of finding her guilty on the bank fraud conspiracy count. But the defendant never objected to this instruction on these same grounds in the district court. In any event, the district court did not err, let alone plainly, in instructing the jury in accordance with the indictment and the law. To the extent

the district court erred, the defendant fails to even allege an effect on her substantial rights.

## Issues Presented

1.     Did the district court abuse its discretion when it ruled that the defendant's allegations of domestic abuse were inadmissible at trial? If so, was the error harmless?

2.     Did the district court plainly err when it instructed the jury that, if it found the defendant guilty of the conspiracy charged in Count One, it could also find her guilty of the money laundering charges in Count Four and Count Five?

## Statement of the Case

### A.     The district court's evidentiary ruling on the defendant's allegations of abuse.

At trial, the defendant did not dispute that she helped her husband, Kindambu, prepare and submit two PPP loan applications to Bank of America (one for each of their two companies[3]). Prior to 2020, Kindambu embarked on a new business venture in the aviation sector and created two companies to facilitate that business venture: an operations-focused company (Papillon Air, Inc.) and a

---

[3] Although the two companies were registered in the Kindambu's name, the trial evidence referenced in this brief clearly shows that the defendant was her husband's partner in setting up the businesses and making decisions for the businesses, and that she was listed as a senior officer of the businesses in their official documentation.

holding company (Papillon Holdings, Inc.) (collectively, the "Papillon companies").

In the process of setting up this new business venture, Kindambu purchased aviation equipment and leased hangar space and office space at the Leesburg Executive Airport in Loudoun County, Virginia. However, by the time the COVID-19 pandemic started in March 2020, the venture had not begun its operations in earnest. Importantly, this meant that the Papillon companies did not have any employees for whom they paid payroll taxes, nor did they have independent contractors that were reported on IRS Forms-1099. In other words, those two companies were not eligible to receive PPP loans because they had no qualifying payroll, and therefore had no "average monthly payroll" on which they could base a PPP loan request.

Notwithstanding, the defendant and her husband made a plan to submit two PPP loan applications, one for each of the Papillon companies. The couple communicated about their plan through text messages and emails. The private financial institution through which their two PPP loan applications were submitted was Bank of America. Kindambu had a friend named Kobe who worked as a banker at their local Bank of America branch, and he was the first person who told the Kindambu about PPP loans. On April 3, 2020, Kindambu submitted two PPP loan applications to Bank of America: one for Papillon Air, Inc. and one for

Papillon Holdings, Inc.  JA147, JA173-JA174.

At trial, the defendant did not dispute that these two applications contained false information, including false AMP figures.  The defendant did not dispute that she also created and caused to be submitted to Bank of America several Excel spreadsheets, nor did she dispute that she filled those spreadsheets with purported payroll information for the purpose of supporting the AMP figures in the two applications.  The defendant did not dispute that the payroll information she inputted into those Excel spreadsheets was entirely false, nor did she dispute that the spreadsheets list approximately 47 names of "employees" and "contractors" who, in reality, never did any work for either of the Papillon companies.  Notably, the data in the defendant's payroll spreadsheets claimed that many of those 47 "employees" and "contractors" had worked for at least one of the Papillon companies *throughout all of 2019 and the first quarter of 2020*, despite the fact that they had no operations until mid-December 2019 and never filed payroll taxes or Forms-1099 for anyone in the first quarter of 2020.

Instead, the defendant's primary defense at trial was that she did not *know* that the PPP loan applications she helped to prepare, the supporting documents she created (i.e., the Excel spreadsheets), and the payroll information she put in them were completely false.  She claimed that Kindambu ordered her to produce those applications and payroll spreadsheets, but refused to tell her anything about them,

so she never knew that the information in them was false.

In order to bolster the credibility of this defense, the defendant sought to testify, and to introduce her own prior statements, about allegations that Kindambu had been abusive toward her on several occasions. The prior statements she sought to introduce were made four months after the PPP loan applications were submitted. The prior statements made no mention of when this alleged abuse took place, nor did they reference any connection between the alleged abuse and the defendant's participation in creating and submitting the PPP loan application materials.

The government argued that any testimony regarding allegations of domestic abuse would be irrelevant to the issue of whether the defendant violated the conspiracy, bank fraud, and money laundering statutes charged in the indictment. The government also argued that, even if evidence of abuse was somehow relevant, it should be excluded under Federal Rule of Evidence 403 because any probative value would be substantially outweighed by a danger of unfair prejudice.

In response, the defendant argued that the alleged abuse was relevant to her defense because her fear of that abuse had dissuaded her from asking her husband the types of questions that would have led her to learn of the false nature of the information she was putting into the PPP loan applications and the payroll spreadsheets. In other words, she argued that her ability to testify about the alleged

abuse was relevant because it would allow her to more credibly claim that she did not know the payroll information was false, and that, therefore, she did not have the requisite *mens rea* to commit the offenses charged in the indictment.

At the motions hearing on this issue, the defendant argued that, "domestic abuse inherently, inherently pressures the abused spouse into doing things that they don't necessarily -- or they -- that they don't question things, they do things without pushing that envelope because they don't want to deal with the consequences. . . . [I]f that's, in fact, true and somebody felt compelled not to question financial records, not to question certain things but just to act accordingly, as told by that individual, that would be relevant." JA101.

The government argued that the defendant's argument was, essentially, a claim to the affirmative defense of duress, albeit with a slight variation. In the standard case, a defendant claiming the duress defense would admit that she had *actual knowledge* that she was inputting false information into the applications and the spreadsheets, but that she only did it due to fear of harm. However, in this case, the jury instructions made it clear that the knowledge requirement in the bank fraud statute could be satisfied by *either* actual knowledge of the false representation *or* "reckless indifference as to whether it was, in fact, true or false." JA878.

Based on the "reckless indifference" prong of the statute's knowledge

requirement, the government argued that the defendant's claim was, at bottom, a duress defense with a slight variation: rather than arguing that she *knew* about the falsehoods (but nevertheless participated due to fear of harm), the defendant was arguing that she *purposely did not ask about the truth* (i.e., was "recklessly indifferent" to the truth) due to fear of harm. The government agreed that, if the defendant was affirmatively claiming this defense, and if she could present sufficient evidence to establish that defense, then evidence of domestic abuse could be relevant. But, in order to claim this defense, the defendant would have to admit that she was at least "recklessly indifferent" to the truth of the information she inputted into those PPP loan applications and supporting payroll spreadsheets.

Defense counsel made it clear that they would make no such admission. "[The defendant] does not need to make a claim of duress for allegations of domestic abuse to be relevant and admissible. [The defendant] is entitled to present and produce any evidence that supports her position in the case, regardless of whether that position includes allegations of domestic abuse. If it is consistent with the Defense's theory of the case, then we are entitled to present it." ECF No. 104 at 8.

At the motions hearing, the defendant reiterated, "we do not intend to present a duress defense. Duress defense would mean admitting you did something illegal, like, trying to explain why you did it. That's not what we're doing. . . .

10

[The defendant] felt compelled to do things on behalf of [her husband]." JA98-JA99. The court responded, "That sounds like a duress defense." JA99. The defendant replied, "That's not a duress defense. That's just saying that you're more inclined not to question someone, not to question what they tell you to do, not to pull back the curtains on certain things, certain aspects of their business. . . . That's the bigger picture that's involved here. And that doesn't go to duress. We're not going to argue duress." JA99.

The court then asked, "But isn't compulsion at least a subset of duress?" JA99. The defendant replied, "I don't think so at all. We're not arguing that she committed an illegal act and she felt compelled to commit the illegal act. We're arguing that she didn't look into some matters that the government claims she knew but she didn't know. And that the reason she didn't do that is the overall circumstances of the relationship." JA99-JA100.

The district court ruled that any reference to abuse, either from the prior statements or in live testimony, would be excluded because it was irrelevant. The district court explained that "[the abuse allegation is] an inflammatory thing that really has nothing to do with the resolution of the case. If you were putting on a classic duress defense, and I'm not saying you should or should not, that's one thing, you can get in those circumstances that you believe suggest that duress is applicable." JA100; *see also* JA44 (district court's order). Although the district

court excluded evidence pertaining to domestic abuse, it nonetheless permitted the

defendant to testify that she felt compelled to commit the crimes due to her

relationship with her husband:

> What I'm going to allow is this – and again, this is a decision that you need to make. If your client decides to testify – and I'm not encouraging her to testify, that's something you and your client have to decide – and you ask her the question, 'Why did you do this?' I will give her some latitude to say that 'I felt I needed to do that.' But the term 'abused' or 'beaten' or something like that cannot come in. I'll let her respond: 'I felt compelled to do that.' And leave it at that. . . . That's if she testifies. . . . Again, your client may be able to get into it on your direct examination to some degree, but she's not going to be able to use the term 'abused' or 'beaten' or anything like that. She felt compelled to do it because of her relationship with her husband.

JA100-JA102.

After the trial began, this issue came up again. Outside the presence of the

jury, the court reiterated its earlier ruling to the parties:

> The information or suggestion of any abuse that occurred between [Kindambu] and [the defendant] is not relevant to the issues that we need to resolve. The issue in this case is whether or not [the defendant] is found guilty of engaging in fraudulent activity with regards to her application for a PPP loan. Nothing to do with whether or not there was an abusive relationship that may or may not exist between the parties. And I'm going to preclude you from asking any questions or even suggest that is a part of your examination.

JA484-JA485.

Notwithstanding the court's prohibition on mentioning "abuse," the court

nevertheless permitted defense counsel to argue to the jury that the defendant did

not have knowledge of the fraud scheme because her husband took advantage of

her, pressured her to do things she did not want to do, and she felt compelled to do

what he told her. During the opening statement, defense counsel told the jury that

the defendant's first husband had tragically died of cancer a few months before she

met Kindambu, and that she was in a vulnerable state, being "devastated,"

"depressed," and "manic." JA124. "Unfortunately, a few months after that, she

met [Kindambu]. . . . He was a shoulder for her to cry on. . . . And then he got her

to foolishly marry him." JA124. Defense counsel continued:

> Now, I wish I could tell you that things started off great at least in their
> marriage, but they didn't. . . . [I]t became very clear, very quickly that
> Mr. Kindambu only wanted her in his life to do the tasks that he did not
> want to do, both in his personal life and also in his business life as well.
> This became clear from the beginning during the 2019 into the 2020
> holiday season when [the defendant] was spending time with her sisters
> and her family for the first time since her [first] husband had passed
> away. The family was in town and her sister, Elizabeth's birthday
> happened to be on January 1st. But despite all of that, [the defendant's
> husband] pressured [the Appellant] to travel all the way to the
> Democratic Republic of Congo to deliver a package for him. . . . So
> despite the circumstances, despite her family being there visiting,
> without even knowing what was in the package, she simply trusted him
> and she did it. And she felt compelled to do what he wanted. And that
> anecdote represented a pattern that was developing.

JA124-JA125.

Defense counsel ended her opening statement by reiterating, "[The

defendant] struggled at times with the way that [her husband] simply used her and

assigned her tasks . . . . [H]e was able to take advantage of her because she was

vulnerable. . . . The evidence will show you that [the Appellant] had no knowledge

of the conspiracy." JA126-JA131.

During the trial, over the objection of the government, the court also allowed defense counsel to present the defendant's sister as a witness, despite the defendant's sister having no evidence to offer related to the offenses charged. The sole purpose of the defendant's sister's testimony was to describe the international trip incident and to explain her perception of her sister's behavior while under the controlling influence of the defendant's husband. JA780-JA790.

During defense counsel's closing argument, he again reiterated the point that the defendant did not know that the documents she created were false because she blindly followed the orders of her husband. JA895. The closing argument recounted the international trip incident again to explain how she had acted without having knowledge. "Remember that pattern started early because we heard the testimony from [the defendant's] sister . . . . She did that task for [her husband]. Didn't question it. Did it because he wanted her to." JA895.

**B.    The jury finds the defendant guilty on all counts.**

In its jury instructions, the court instructed the jury that, if the defendant was found guilty of Count One (conspiracy), then she could also be found guilty of any of Counts Two through Five, so long as some member of the conspiracy committed the substantive offense in that count. JA869. Counts Two and Three are for substantive bank fraud, and Counts Four and Five are for money

14

laundering. Ultimately, the jury found her guilty on all counts. The district court sentenced the defendant to twenty-four months' imprisonment.

This appeal followed.

## Summary of Argument

First, the district court did not abuse its discretion when it excluded the defendant's testimony and prior statements regarding allegations of domestic abuse. Those allegations were not relevant evidence and, even if relevant, any probative value they might have would be substantially outweighed by a danger of unfair prejudice, confusing the issues, and misleading the jury. *See* Fed. Rules of Evidence 401, 403.

Nor did the district court's exclusion of irrelevant and prejudicial domestic abuse evidence implicate the defendant's constitutional rights. Evidentiary rulings that implicate constitutional rights are subject to harmless error review. So, even if the district court erred in excluding that evidence, any error was harmless when viewed in the context of the overwhelming evidence presented at trial that she had knowledge of the fraud.

The defendant's argument was that the domestic abuse evidence would allow her to more credibly claim that she did not know the information she inputted in the payroll spreadsheets was false, and that she was not recklessly indifferent to whether the information was true or false. However, the

government's voluminous evidence directly rebutted the defendant's claimed lack of knowledge. That evidence provided overwhelming proof that the defendant knew she was inputting false information into those spreadsheets, and that she did so with the intention of defrauding the victim financial institution.

Second, the district court did not plainly err when it instructed the jury regarding the implications of the conspiracy in Count One. As an initial matter, the defendant did not properly preserve this issue for appeal because she did not object to this instruction on these same grounds in the district court.

Even if she had properly preserved this issue for appeal, there is no plain error here because the instructions, taken as a whole, adequately stated the controlling legal principles governing conviction on the money laundering counts (Counts Four and Five). The conduct underlying Counts Four and Five was charged in the Indictment as part of the conspiracy laid out in Count One and, therefore, that conduct was contemplated in the conspiracy charged in Count One.

Moreover, even if Counts Four and Five were not contemplated by the conspiracy charged in Count One, the jury instructions, taken as a whole, make clear that the defendant was convicted of Counts Four and Five, not based on conspiracy liability for the actions of a co-conspirator, but based on her own direct, substantive actions with respect to those counts.

Accordingly, this Court should affirm the judgment.

**Argument**

I.   **The district court correctly excluded domestic abuse testimony and evidence.**

    A.    **The district court did not abuse its discretion in excluding domestic abuse evidence while permitting the defendant to testify that she felt compelled by her husband.**

The defendant claims that the district court denied her the constitutional right to present a complete defense at trial when the district court ruled that she could not discuss allegations of domestic abuse without claiming the duress defense. However, "[w]hile [the defendant's] argument is couched in terms of [her] due process right to defend [herself], the crux of [her] complaint is that [she] was not allowed to present a particular defense. As such, it is better framed as an evidentiary argument." *United States v. Malloy*, 568 F.3d 166, 177 (4th Cir. 2009). This Court reviews such arguments for abuse of discretion. *Id.* "A trial court abuses its discretion when it acts arbitrarily or irrationally, fails to consider judicially recognized factors constraining its exercise of discretion or relies on erroneous factual or legal premises." *United States v. Uzenski*, 434 F.3d 690, 709 (4th Cir. 2006).

Here, the trial court's evidentiary ruling came after thorough briefing by the parties and several rounds of oral argument. The defendant argued to the district court that her theory was not one of duress because she was not claiming that the threat of abuse caused her to do something that *she knew* was fraudulent. Instead,

she claimed that the threat of abuse caused her to *intentionally avoid* asking the types of questions that, if answered, would have led to her learn that she was doing something fraudulent. In reality, this is just another way of saying that the threat of abuse caused her to be "recklessly indifferent to the truth," which is still a claim of duress.

After obtaining a full understanding of the case's factual background and the parties' legal arguments, the district court ruled that, absent a claim of duress, the defendant's proffered evidence of abuse was irrelevant to the issue of whether she had the requisite knowledge to be guilty of engaging in a bank fraud and money laundering conspiracy. The district court further ruled that, even if tangentially relevant to the question of *mens rea*, the proffered evidence of abuse had little probative value to the issues in the trial, and that the probative value was substantially outweighed by a danger of unfair prejudice. *See* JA100–JA102; JA484-JA485.

This ruling was neither arbitrary nor irrational. The district court did not fail to consider judicially recognized factors constraining its exercise of discretion, nor did it rely on erroneous factual or legal premises. Therefore, the district court did not abuse its discretion. Moreover, as explained below (Section I.C), any error is harmless.

**B.    Alternatively, the district court's evidentiary ruling did not deny the defendant the constitutional right to present a defense.**

The defendant also argues that the exclusion of domestic abuse evidence implicated her constitutional right to a defense. Such claims are reviewed de novo, but also subject to harmlessness review. *See United States v. Williams*, 632 F.3d 129, 132 (4th Cir. 2011).

Here, the district court's evidentiary ruling did not violate the defendant's constitutional right to present a defense because "a defendant's right to present a defense is not absolute." *United States v. Rand*, 835 F.3d 451, 459 (4th Cir. 2016) (quoting *United States v. Prince–Oyibo*, 320 F.3d 494, 501 (4th Cir. 2003)). "The Constitution leaves to the judges who must make these decisions wide latitude to exclude evidence that is repetitive, only marginally relevant or poses an undue risk of harassment, prejudice, or confusion of the issues." *Id.* (quoting *Crane v. Kentucky*, 476 U.S. 683, 689–90 (1986)).

At trial, the defendant argued to the jury that she did not know that the PPP loan documents that she created were fraudulent. In order to bolster the credibility of that claim, she wanted to be able to give a specific reason for her lack of knowledge: fear of abuse. Put succinctly, she wanted to argue to the jury that she did not know she was creating fraudulent PPP loan documents because she did not ask questions about them, and she did not ask questions about them because she

19

was afraid of being abused if she did.

In furtherance of this claim, she sought to introduce evidence from an audio recording of a conversation that took place 3-4 months after the criminal conduct for which she was convicted. During that conversation, the defendant specifically referenced an alleged abuse incident from four days earlier by her husband, and then made vague allusions to other instances of abuse. During the recording, the defendant did not state when these other instances of abuse took place, nor did she claim that any of the alleged abuse had anything to do with the PPP loan applications.

After briefing by the parties and oral argument on this issue, the district court ruled that, in the absence of an affirmative claim of the "duress" defense, allegations of domestic abuse were not relevant evidence; and, even if relevant, they should be excluded under Federal Rule of Evidence 403 because their probative value is substantially outweighed by a danger of unfair prejudice. The district court clarified that, if the defendant testified, she would be permitted to explain why she participated in creating the PPP loan documentation, and she would be permitted to explain that she felt compelled to participate, but she would not be able to use the words "abused" or "beaten." Furthermore, her counsel would not be able to argue that "abuse" played a role in her actions. JA98-JA102.

Consistent with this ruling, the district court allowed defense counsel to

argue, both in their opening statement and closing argument, that the defendant was under the compelling influence of her husband during the time this fraud took place. The district court even allowed defense counsel to introduce the testimony of the defendant's sister, despite the defendant's sister having no evidence to offer related to the offenses charged. The sole purpose of the defendant's sister's testimony was to explain her perception of her sister's behavior while under the controlling influence of the defendant's husband.

The district court did not violate the defendant's constitutional right to present a defense when it made its evidentiary ruling regarding the domestic abuse allegations. As this Court has recognized, "a defendant's right to present a defense is not absolute. . . . The Constitution leaves to the judges who must make these decisions wide latitude to exclude evidence that is repetitive, only marginally relevant, or poses an undue risk of harassment, prejudice, or confusion of the issues." *Rand*, 835 F.3d at 459. Here, the district court, using its "wide latitude to exclude evidence," ruled that the allegations of domestic abuse in this case, absent a claim of duress, were only marginally relevant and posed an undue risk of prejudice and confusion of the issues.

As further evidence that the district court did not prevent the defendant from presenting a defense, it permitted defense counsel to argue to the jury and to introduce witness testimony that the defendant lacked knowledge about the fraud

because her husband took advantage of her, pressured her to do things she did not want to do, and she felt compelled to do what he told her. This included the district court allowing, over the government's objection, testimony from the defendant's sister that had nothing to do with the crimes charged in the indictment, and only served as evidence of the compelling and influential effect of the Kindambu on the defendant. This shows that the defendant was not denied the right to present a defense that she lacked the requisite knowledge to be guilty of the charged offenses. This Court should affirm.

### C. Even if the district court abused its discretion in excluding the evidence, any error was harmless.

Even if this Court concludes that the district court's evidentiary ruling violated the defendant's right to present a defense, any error was harmless in the context of the overwhelming evidence presented at trial. When an appellate court finds a constitutional violation in an evidentiary ruling, harmless error review applies. *Williams*, 632 F.3d at 132; *see also Rand*, 835 F.3d at 460–61. Harmless error review "requires a reviewing court to quantitatively assess the effect of the error in the context of other evidence presented at trial." *Rand*, 835 F.3d at 461.

When reviewing errors in evidentiary rulings under the "harmless error" standard, the appellate court "simply reviews the remainder of the evidence against the defendant to determine whether the [error] was harmless beyond a reasonable doubt." *Arizona v. Fulminante*, 499 U.S. 279, 310 (1991). The Supreme Court

explained that applying harmless error review "is essential to preserve the 'principle that the central purpose of a criminal trial is to decide the factual question of the defendant's guilt or innocence, and promotes public respect for the criminal process by focusing on the underlying fairness of the trial rather than on the virtually inevitable presence of immaterial error.'" *Id.* at 308 (quoting *Delaware v. Van Arsdall*, 475 U.S. 673, 681 (1986)).

Here, the defendant sought to introduce evidence of abuse in order to provide a more credible explanation for her claim that she did not know she was engaging in fraud. The voluminous evidence introduced at trial directly rebutted that claimed lack of knowledge. The government's evidence provided overwhelming proof that the defendant knew she was inputting false information into the payroll spreadsheets, and that she did it with the intention of defrauding the victim financial institution. Therefore, even if the defendant had been allowed to argue that her allegations of domestic abuse explain why she did not know about the fraud, such arguments would not have been able to overcome the overwhelming evidence of her knowledge.

### 1. The defendant's intimate involvement with the Papillon companies

First, the jury heard testimony from a Bank of America representative who walked the jury through the payroll report spreadsheets it received as part of the PPP loan applications for the Papillon companies. He explained that both

23

companies' spreadsheets claimed that they had a combined 47 employees and independent contractors working for them for the entirety of 2019 and the first three months of 2020. JA158-JA161, JA182-JA183.

The jury also heard testimony from an aviation consultant that the defendant and her husband hired to help develop the Papillon companies in January 2020. The consultant testified that he had worked in the aviation sector for over 30 years, and that he had worked for various aviation companies at the Leesburg Executive Airport during that time. JA267-JA268. He testified that there were only about 10 businesses housed at the Leesburg Executive Airport in 2019, and that those businesses had a combined total of about 50-60 employees, but none of those individuals worked for the Papillon companies. JA268.

The consultant also testified that he initially met with both the defendant and her husband in January 2020 about a job opportunity with the Papillon companies, and that both the defendant and her husband explained to him "*their* business plans" for the companies. JA272 (emphasis added). After that meeting, the consultant received a follow-up call from the defendant to contract his services. JA272-JA273.

So, starting in January 2020, the consultant began spending a lot of time at the Leesburg Executive Airport office space that the defendant and her husband used for their businesses. The consultant testified that the office space was an open

floor plan with approximately six desks, and that it was not large enough to accommodate even 20 workers, far fewer than the 47 employees and contractors claimed by the defendant's payroll report spreadsheets.  JA275-JA277.

The consultant testified that, from the time he started doing work for the defendant and her husband in January, the defendant was consistently in that office space when he was working there.  JA277.  In fact, she would bring two computers to that office space: one computer was for doing work for the Papillon companies, and the other was for doing work for her day job as a government employee. JA278.  Later, the defendant's supervisor from her government job confirmed what the consultant said, testifying that "[s]he was a 100 percent teleworker" even before the pandemic.  JA361.

From this testimony, the jury learned that the defendant was present at the office space constantly, was consistently engaged in work for the Papillon companies (to the point of putting her Papillon computer next to the computer for her actual job), and, therefore, would have been intimately knowledgeable about the companies' operations.  Thus, she would have known that the Papillon companies did not have 47 employees and contractors.  Also, because she was in the office so regularly, she would have seen the same thing the consultant saw: empty office space, which would have further made it clear to her that the Papillon companies did not have 47 employees and contractors.

The consultant testified that, in all the time he spent at the airport in 2019 and working directly in the Papillon companies' office space during the first quarter of 2020, he did not know of anyone besides himself who was an employee or contractor for the Papillon companies. JA280. Finally, the consultant testified that he did not recognize any of the names of supposed "employees" and "contractors" that the defendant listed in the payroll report spreadsheets submitted to Bank of America. JA281-JA283. The consultant's name was not included in any of the spreadsheets.

If the consultant worked alongside the defendant for months, and he had never heard of any of the supposed employees and contractors listed in her spreadsheets, the jury could easily infer that the defendant fabricated those names or, at the very least, that she knew those individuals did not do work for the Papillon companies.

The jury also heard testimony from the defendant's teenaged stepdaughter (Kindambu's daughter from a prior marriage), who testified that she visited the Papillon companies' office space at the Leesburg Executive Airport approximately once or twice per week during the first quarter of 2020. JA452. She testified that, every time she visited that office space, the defendant was there working. JA452. She also confirmed what the consultant had stated – that the defendant brought two computers to the office space and used one to do work for the Papillon companies

26

and the other to do work for her government job.  JA452-JA453.

This testimony echoed that of the consultant and was strong corroborative evidence to the jury that the defendant was constantly working in the Papillon companies' office space on projects for the Papillon companies in the first quarter of 2020.  This showed the jury that the defendant was intimately involved with the companies and, therefore, would have known if there were dozens of employees or contractors working for them.  This also showed the jury that the defendant was constantly present in the empty office space, even during weekdays (hence the government computer), and knew that there was no one else working there.

## 2.     The defendant's communications with her husband

The jury also heard testimony that, after the two PPP loan applications were submitted on April 3, 2020, Bank of America requested documentation to support the AMP figures in those applications.  The jury then saw the text messages that the defendant sent to her husband, laying out *her* ideas on how to create and submit false payroll reports that would justify the AMP figures in the applications.  On April 5, 2020, the defendant sent a text message to her husband saying, "At this point, we'll create the payroll reports for periods stated by employee. SBA is not IRS so if you're ready to take a leap of faith and a chance, we'll figure it out." JA929-JA930.  In her next text message, she added, "I'll generate the reports from free templates. Current: figure how payments can be justified. Future: We know

27

the risks, lay low on SBA initiatives, do taxes etc." JA931. Her husband responded, "Yep." JA931.

From these messages, the jury saw that it was *the defendant* who encouraged her husband to "take a leap of faith and a chance" on this scheme, ensuring him that they would "figure it out." Contrary to the defendant's assertions that "[her husband] had her assemble the payroll spreadsheets," Def. Br. 3, these messages demonstrate that it was *the defendant's* plan to create false payroll spreadsheets, and that she volunteered to create them herself, saying "I'll generate the reports."

These messages also demonstrate that she knew the information in the payroll spreadsheets would be false, because (1) she never inquired about using legitimate payroll reports or data, showing that she knew such reports and data did not exist; (2) her plan included "figuring out how to justify" the payroll figures (which she would not need to do if the payroll data was legitimate); and (3) her plan acknowledged that they knew "the risks" associated with the fraud, and that they would minimize those risks by "laying low" on other SBA initiatives. This is a far cry from the defendant's argument that she was compelled, by the threat of violence, to make the payroll spreadsheets and to not ask any questions about them. These messages directly contradict the argument that the defendant did not know that she was inputting false information into the PPP loan applications and the supporting payroll report spreadsheets.

28

The jury also saw that, the next day, on April 6, 2020, the defendant sent an email to her husband with subject line, "BOA PPP Loan You Tube." The text of that email contained a link to a YouTube video titled, "Bank of America - Paycheck Protection Program (PPP) Loan Application." Also in the text of the email, the defendant educated her husband on the PPP loan parameters, she explained to him how she had falsified the AMP figures that they included in the PPP loan applications, and she proposed a plan for how they could attempt to justify the false figures by claiming that they had used 1099 contractors. JA955. The defendant told her husband:

> Saw this. To get to our numbers, we grossly exaggerated monthly. The first, Papillon we did the monthly was approx. $700,000 to get a loan of $1.7 million. The next I went up close to what Kobe suggested $5 million loan. Which meant the numbers were super high. The loan is your monthly * 2.5. I've asked Kobe to locate your application to get exact information. I recall what was done for the most part. Offset can be done with Contractor issued 1099 we can claim creates the discrepancy. Can indicate was included in payroll.

JA955. This email is further evidence, and even stronger evidence than the April 5 text messages, that the defendant knew that the information she put in the PPP loan applications and the supporting payroll report spreadsheets was false.

### 3. The ADP payroll templates

The next day, on April 7, 2020, the defendant and her husband procured the "free templates" of payroll reports that she had mentioned in her April 5 text message. They procured these reports under false pretenses from ADP, a company

that provides payroll administration services for other businesses. The defendant was able to procure these reports after she and her husband began communicating with a sales representative at ADP. At trial, that ADP representative testified that he was introduced to the Appellant and Kindambu as potential new clients for ADP. JA379-JA381. The ADP representative testified that Kindambu identified the defendant as "a decision maker for the business" just like him, and he informed the ADP representative that it was fine to work with either of them. JA381.

The ADP representative also testified that the defendant and Kindambu both expressed to him their desire to have the Papillon companies become clients of ADP and to have ADP handle the payroll for both companies from then on. JA381. As part of the standard process for bringing on new clients, the ADP representative requested the recent payroll reports for the Papillon companies so that ADP would know who was currently on the companies' payrolls and how much to pay them going forward. JA381-JA382, JA391. The ADP representative testified that the defendant and Kindambu asked him to send them examples of payroll reports so that they would know what type of information he needed from them. JA382. This is how they procured the "free templates" that the defendant had mentioned in her April 5 text message.

On April 7, 2020, the defendant sent a text message to her husband saying, "[The ADP representative] called back and will send actual reports." That same

day, the ADP representative sent an email to the defendant (but not to Kindambu) with Excel spreadsheets attached. Those Excel spreadsheets were the legitimate internal payroll reports that another company had submitted to ADP when it went through the process of becoming an ADP client. JA382-JA383, JA917-JA918. The ADP representative testified that he sent those real payroll reports to the defendant at her request so that she could see an example of the type of information he would need in order to enroll the Papillon companies in ADP's services. JA382-JA383.

After he sent those payroll reports to the defendant only, the ADP representative sent an email to the defendant and Kindambu saying, "We are good here just missing the right reports. I have been in touch with [the defendant] and I know she is working hard on it." JA919. However, after he sent those payroll reports to the defendant on April 7, he never heard from the defendant or Kindambu again. JA383, JA391. In this way, the defendant procured the "free templates" on which she would base the false payroll spreadsheets for the Papillon companies in order to satisfy Bank of America's request for supporting documentation.

### 4. Kindambu discusses with the defendant the possibility of abandoning the fraud scheme

The jury also saw a text message conversation between the defendant and Kindambu in which he invites her to abandon the fraud scheme if she isn't

"feel[ing] it." On April 7, 2020, the defendant and her husband discussed in text messages whether to continue moving forward with submitting payroll reports for the PPP loan applications. Kindambu told her, "[You] can judge. If you don't feel it leave it!" JA935. The defendant responded, "If you are ok, we proceed. You also have to feel ok." JA935-JA936. Kindambu told her to speak to Kobe about their applications. JA936. She responded, "I have spoken to Kobe at length about he convinced me it a GO. I will work on reports . . . ." JA937. In subsequent messages, the couple agreed that they would move forward with the reports and the application process. JA937-JA939.

These messages prove that the defendant was not coerced by threat of violence into blindly obeying Kindambu's orders; rather, she was given every opportunity to abandon the fraud scheme, and she chose instead to move forward in partnership with her husband. These messages also confirm that she is the one who created the false payroll report spreadsheets.

### 5.    The defendant creates the false payroll report spreadsheets

The jury also saw a text message from the defendant to her husband in which she complains about how difficult and tedious the process is to falsify the payroll report spreadsheets. In the late evening of April 7, 2020, several hours after the defendant received the payroll report spreadsheets (in Excel format) from the ADP representative, she sent a text message to Kindambu to update him on her

progress with editing the spreadsheets sent by ADP in order to create false payroll report spreadsheets for the Papillon companies. The defendant told her husband, "The report is a lot and not even 5% done since 7. I need to manually figure fed tax, state, Medicare etc plus the spreadsheet has a macro which was disabled creating formula issues." JA940. An hour and a half later, she sent her husband a text message saying, "I'm finishing PA 2019 and hope to do 1st qtr 2020." JA942. The initials for "Papillon Air, Inc." are PA.

These messages demonstrate that the defendant used the Excel spreadsheets that she received from ADP (which already had "macro" settings programmed into them that made her falsification process more difficult) and she manipulated them to create the false payroll report spreadsheets that were submitted to Bank of America to support the Papillon companies' PPP loans. These messages also showed the jury that the defendant knew that the information she was inputting into the spreadsheets was false because, if the payroll data was legitimate, it would already include the figures for federal and state taxes. So, the fact that she had to "manually figure" those taxes shows that she knew that information was false.

Also, a later message from the Appellant to her husband contains a picture of several papers. JA942, JA953. On the far-right side of the picture, there are two papers with handwritten (or "manually figured") calculations on them. JA942, JA953. The final number written at the bottom of one of the papers is "7,181,552."

33

JA942, JA953. In a later text message, the defendant told Kindambu, "This is the very first document I completed," and she attached a picture. JA952, JA954. That picture shows a computer screen that is displaying an online PPP loan calculation worksheet, and the figure listed for total 2019 payroll is "7,181,552."

These picture messages confirmed for the jury exactly what the defendant meant when she complained about having to "manually figure" the payroll calculations: she handwrote those calculations on paper, and then inputted them into the PPP loan applications and the payroll report spreadsheets. This was further evidence for the jury that the defendant knew that data was false because she fabricated it herself and sent a picture showing her handwritten calculations as evidence of that fabrication.

The jury also saw the emails that the defendant sent to Kindambu containing the first drafts of the fraudulent payroll report spreadsheets. The next day, April 8, 2020, the defendant sent an email to Kindambu with the subject line, "The reports." JA956. That email contained two Excel spreadsheet attachments with payroll information: "Papillon Holdings Inc 2019-Mar2020 Payroll Summary YTD_v1.xlsm" and "Papillon Holdings Inc Tax Fillings 2019_Mar272020.xlsx." JA956.

The day after that, April 9, 2020, the defendant sent an email to Kindambu with the subject line, "Papillon Air Information." JA 957. That email also

contained two Excel spreadsheet attachments with payroll information: "Papillon Air Tax Filling Information.xlsx" and "Papillon Air Inc 2019-Mar2020 Payroll Summary YTD_vl.xlsm."  JA 957.

Two of those four spreadsheets contain metadata showing that they are not original documents that were created for the Papillon companies, but rather that they are merely edited versions of the exact spreadsheets that the ADP representative sent to the defendant.  According to the testimony of the ADP representative, the payroll reports that he sent to the defendant came from a real company called Chiron Physical Therapy.  JA382-JA383, JA917.  The owner of that company, John Krupa, also testified at trial.  He confirmed that the payroll reports that were sent to the defendant by the ADP representative were the same payroll reports that he created and gave to ADP when his business was going through the process to become an ADP client.  JA400-JA403.

Krupa also confirmed that the metadata in those payroll reports showed that he created them for his company, Chiron Physical Therapy.  For example, Krupa confirmed that the "Info" tab of one of the payroll reports lists him (John Krupa) as the author of the document.  JA405.  He also confirmed that the same "Info" tab lists the document's creation date as December 13, 2019, at 12:44 p.m.  JA405.

Two of the four spreadsheets that the defendant sent to her husband on April 8 and 9, 2020, contained those same metadata markers showing that those

35

documents were created by Krupa on December 13, 2019 at 12:44 p.m.  JA569-JA570, JA575-JA577.  The other two spreadsheets that the defendant sent to her husband were not created by Krupa, but follow the same exact format as the ones created by him, suggesting that the defendant simply "copied and pasted" the format into new Excel spreadsheets and edited them from there.

Lastly, Krupa testified that his payroll reports were generated by payroll software (Quickbooks), and that this software automatically attached a header to the reports that read, "Chiron Physical Therapy of VA, LLC. Payroll Summary from January 1 through December 13, 2019."  JA407-JA408.  However, this header is not visible when viewing the report in Excel format; rather, it only becomes visible when the document is converted to PDF format or when it is printed.  JA407-JA408.  At trial, the jury saw that some of the payroll report spreadsheets that the defendant submitted to Bank of America contain this same hidden header that reads, "Chiron Physical Therapy of VA, LLC. Payroll Summary from January 1 through December 13, 2019."  JA659-JA662, JA 963.

This showed to the jury that the defendant had submitted merely edited versions of the "free templates" she had procured from ADP under false pretenses. This is further evidence that she knew of, or was recklessly indifferent to, the falsehoods in the payroll reports spreadsheets she created and submitted: if the payroll data was genuine, she would have used that data in the format it was

36

already in, and would not have needed to manipulate the documents and data of another company.

The defendant does not dispute that the names and salaries listed in those four spreadsheets are false, nor that those people were never employed by either of the Papillon companies. However, in her brief, the defendant claims that Kindambu "did not deny that he provided the employee names and annual salary amounts." Def. Br. 11. This seems to be a roundabout way of insinuating that Kindambu provided the employee names and annual salary amounts to the defendant for her to input into the spreadsheets she created. That is not true.

First, Kindambu did not testify in this case, so he was never asked whether he provided any employee names or salary amounts to the defendant. So, while it is technically accurate to say that he never denied it, that statement is devoid of any real meaning because *he was never asked* to confirm or deny it.

Second, as this brief demonstrates, the government combed through all email and text message communications between the defendant and Kindambu and found no evidence that he ever sent her any employee names or salaries to input into the false spreadsheets.

Third, the emails and text messages discussed above demonstrate strong evidence that the defendant, on her own, came up with the names and salary amounts that she inputted into the false spreadsheets, and that is what the

government argued to the jury at trial.  For example, in the April 6 email, the defendant explained to Kindambu how she "grossly exaggerated" the "monthly" payroll figure and how that translated to a "super high" annual payroll figure. Also, she sent Kindambu the text message explaining how she had to "manually figure" tax withholding amounts, and she sent him the picture message showing those handwritten calculations.

This is strong evidence that the defendant created those false payroll documents herself, and it contradicts any claim that she somehow received the data from her husband, particularly because they are not included in any electronic communication between them prior to appearing in the spreadsheets that the defendant sent to him on April 8 and April 9.

**6.    The defendant submits the false payroll report spreadsheets to Bank of America**

The jury also saw messages from the defendant to her husband in which she explains how she uploaded her false payroll report spreadsheets to Bank of America's online portal.  A representative from Bank of America testified at trial, and he stated that Bank of America instructed PPP loan applicants to upload their application materials through an online portal called Intralinks.  JA139, JA142, JA156-JA157.  On May 2 and 3, 2020, the defendant and Kindambu sent text messages to each other regarding uploading the completed payroll report spreadsheets to Intralinks.  Those messages make clear that the defendant had the

login credentials to access the Papillon companies' PPP loan applications, and that she used those credentials to log in to Intralinks and upload the completed payroll report spreadsheets to Intralinks on those two days. JA606-JA615.

In one of those May 3 messages, Kindambu thanked her for everything she did to prepare and submit the false PPP loan applications and payroll report spreadsheets. He acknowledged to the defendant, "You did all the work." JA618. She responded, "We. It takes two. [Thumbs-up emoji.]" JA618. Bank of America deposited the PPP loan funds into the Papillon companies' accounts shortly thereafter on May 6 and May 13, 2020. JA624-JA625, JA639.

From these messages, the jury saw that the defendant was an active and enthusiastic participant in this scheme, and that she was the person who handled both the creation and submission of the false payroll report spreadsheets. These facts belie the defendant's claim that she was kept in the dark, given no information, and compelled, under threat of abuse, to toil blindly on documents that she did not understand and about which she had no underlying knowledge.

**7.     Other evidence confirms that the defendant knew that the Papillon companies had no earnings and no employees at the time of this scheme**

The jury also saw an email that the defendant sent from her Papillon Air email account (rnsahlai@papillonair.com) to a Wells Fargo banker in late April 2020, days before she submitted the false payroll spreadsheets to Bank of America.

JA601, JA958. The purpose of the email was separate from the PPP loans (which were through Bank of America); this email was sent as part of the defendant's and Kindambu's mortgage application to Wells Fargo. JA959. That email contained no substantive text, but contained an attachment entitled, "Letter of Explanation on No Tax filing 1140 (US Individual Tax Return)-[Kindambu] and US Corporate Income Tax (Form 1120)-[Kindambu] and [defendant]." JA959. The addressee information in the document reads, "Wells Fargo Home Mortgage. Ref: Mortgage Application." JA959.

The document is dated April 27, 2020, which is the same date that the Appellant emailed it to the Wells Fargo banker. JA958-JA959. In the document, under the heading for "Papillon Air Inc.," it reads:

> Papillon obtained a license to conduct aviation services December 2019, and have not reported a full tax year to qualify for tax filings. Estimated tax date will be earliest December 2020 or February 2021. The corporations conducted no business activities, no income, and were essentially shells for the applicable tax year. Hence, we also believed that we did not have to file taxes for the applicable year. [The Appellant's husband] has not worked for any corporation or generated self-employment income in the United States, except Papillon Air that started operations December 2019 as mentioned above.

JA959.

From this document, the jury saw further evidence that the defendant was intimately involved with Papillon Air, Inc. ("PA") because she had her own personalized email address within the PA domain, and she was using it to send

official emails related to securing a mortgage. The jury also saw that, right in the midst of the PPP loan application process wherein the defendant was claiming to Bank of America that PA had paid dozens of employees and contractors millions of dollars throughout 2019, she was contemporaneously claiming to Wells Fargo that PA *started* in December 2019, that it "conducted no business activities" in 2019, had "no income" in 2019, and was "essentially [a] shell for [tax year 2019]." This was compelling evidence to the jury that the defendant knew that the information she inputted into the PPP loan applications and the payroll report spreadsheets was false. The defendant submitted the false payroll spreadsheets to Bank of America knowing that they contained information that completely contradicted the document that she had sent to Wells Fargo only six days earlier.

The jury also saw evidence that, in August 2020, approximately 3-4 months after the defendant and Kindambu had received the $2.5 million in PPP loan funds, the defendant was seeking another mortgage loan, this time through a company called Homespire Mortgage. JA633-JA634, JA961. Homespire Mortgage sent an email to the defendant, asking her, "Were taxes filed for 2019 for Papillon Air? If so, please provide the copies of those taxes; if not, please get a letter from your CPA stating why they did not need to be filed (i.e. no revenue was generated with the company)." JA961. The defendant responded, "No revenues were generated. Started operations December 19 2019. I can get a letter." JA961.

41

Here again, the jury saw that the defendant was speaking authoritatively on the operations of PA in 2019, showing that she was intimately involved with the company. The jury also saw her reconfirm that PA had no operations until the last two weeks of 2019. This was more evidence to the jury that she knew that the employee/contractor names and the 2019 payroll data she listed in the PPP loan applications and payroll report spreadsheets were false.

### 8. Evidence after her husband's arrest

The jury also heard testimony that, approximately five months after the defendant and Kindambu had received the $2.5 million in PPP loan funds, Kindambu was arrested for this fraud scheme. Shortly thereafter, in November 2020, the Loudoun County Circuit Court appointed an attorney to be the temporary custodian for Papillon Air, Inc. and to wind down the company if necessary. JA300-JA301. That court-appointed custodian testified at the defendant's trial.

The custodian testified that, at the beginning of his work, he was put in contact with the defendant. JA304. The defendant told him that she was now the president of PA and was overseeing the operating processes within PA. JA304-JA305. The defendant provided the custodian with a document entitled, "Summary of Papillon Air, Inc. Startup – February 2020." JA311-JA312. She represented to the custodian that this was a document that he could rely on to inform him about the business plan that had been drawn up for PA. JA311-JA312.

The introduction to that document stated, "Papillon Air Inc. effectively commenced business at Leesburg since mid-December 2019. . . . Papillon Air Inc. operates out of Leesburg Executive Airport." JA312-JA313, JA912. The "Management" section of that document listed the defendant as the "General Secretary" of the company. JA312-JA313, JA912. That document also contained a section outlining the "expenses incurred to date." JA313, JA914. The document stated that the total amount that PA had expended on salaries prior to February 2020 was $37,500. JA313-JA314, JA914.

In this way, the jury saw that the defendant was listed as a general officer of PA back in February 2020, showing that she was intimately involved in the company and knowledgeable about its operations. The jury also saw that, from the company's own document, it had only been in existence since mid-December 2019, and had only spent $37,500 in salaries between then and February 2020. The jury saw that this completely contradicted the information that the defendant listed in the PPP loan applications and the payroll report spreadsheets, which claimed that dozens of employees and contractors had worked for PA all throughout 2019, and that PA had spent over $10 million on payroll during 2019. JA322.

The custodian also testified that, when he visited the Papillon companies' office space, the open area would only have accommodated six workers, echoing

the consultant's assessment of the size of the space.  JA303.  He also stated that, while he did find documents related to PA in the office space, he did not find any documents related to payroll or employees or contractors.  JA302.  In the custodian's conversations with the defendant about PA, he never heard about any employees or contractors working for the company, except the consultant.  JA317-JA318.  The custodian also discovered that no taxes had been filed for PA for tax year 2019, including payroll taxes.  JA318-JA319.

When the custodian later reviewed the payroll report spreadsheets that the defendant had submitted to Bank of America, he did not recognize any of the names of supposed employees and contractors in those spreadsheets.  JA319-JA322.  He also testified that he found no evidence to support the claim that PA paid over $10 million to employees and contractors in 2019, which is what the defendant had claimed in PA's PPP loan application and in PA's payroll report spreadsheets that she created and submitted.  JA322.

The testimony and documents produced by the court-appointed custodian at trial showed the jury that the company had virtually no operations or payroll in 2019, that the company created informational materials in February 2020 that openly expressed that fact, and that the defendant was intimately involved in the company from the beginning and, therefore, would have known all of this when she inputted false information in the PPP loan applications and the payroll report

spreadsheets that she created and submitted to Bank of America.

The jury also heard an audio recording of the defendant in which she argued with her stepdaughter about the source of Kindambu's recent wealth. The jury heard the defendant say, "Did your dad tell you that I got 2.5 million from the government for loans that he has been using around? You guys don't know the truth." JA922. The jury also heard the defendant say, "And another thing is you say it was your dad's money. Your dad should be careful. We have all the evidence. . . . You don't understand where the money came from and that's why – Sometimes you guys talk money. You don't know where the money comes from. Even your mom doesn't know where that money comes from." JA923. The jury also heard the defendant say, "I have done all these things. And by the way, the loan even he said he was going to give it back. He's not going to give it back. That money is going to be scot-free because of how I did it." JA924.

Based on the overwhelming evidence listed above, the jury concluded, beyond a reasonable doubt, that the defendant had the necessary knowledge and intent to defraud. Therefore, even if the district court erred in excluding evidence of abuse, that error was harmless when viewed in the context of the overwhelming evidence presented at trial that she had knowledge of the fraud or, at least, was recklessly indifferent to the truth or falsity of her representations in the PPP loan applications and the payroll report spreadsheets.

**II.    The district court correctly instructed the jury.**

The second issue raised by the defendant is that the district court improperly instructed the jury on the implications of the conspiracy in Count One.  Preserved challenges to "jury instructions are reviewed for abuse of discretion. . . . In assessing the propriety of instructions, we will not reverse a conviction so long as the instructions, taken as a whole, adequately state the controlling legal principles." *United States v. Jeffers*, 570 F.3d 557, 566 (4th Cir. 2009).  Where a defendant fails to object to an instruction in the district court, this Court's review is solely for plain error.  *See* Fed. R. Crim. P. 30(d) ("Failure to object in accordance with this rule precludes appellate review, except as permitted under Rule 52(b)."); *United States v. Miller*, 41 F.4th 302, 313 (4th Cir. 2022).

Here, the district court instructed the jury that, if the defendant was found guilty of Count One (conspiracy), then she could also be found guilty of Counts Two through Five, so long as some member of the conspiracy committed that substantive offense.  JA869.  The defendant never objected to this instruction below.  To the extent the defendant claims in reply that her other objections preserved the challenge she now makes on appeal, this Court should reject this argument.

On appeal, the defendant argues that this instruction was erroneous because Counts Four and Five are not part of the conspiracy charged in Count One of the

46

Indictment. Therefore, according to the defendant, the instruction regarding her responsibility for substantive offenses committed by co-conspirators incorrectly assigned criminal liability to her for Counts Four and Five. As part of this argument, the defendant invokes Fifth Amendment principles as well as Rule 7 of the Federal Rules of Criminal Procedure. Def. Br. 50-55. The defendant never made any such arguments below.

"Arguments raised in a trial court must be specific and in line with those raised on appeal." *In re Under Seal*, 749 F.3d 276, 287 (4th Cir. 2014). "To preserve an issue for appeal, an objection [or argument] must be timely and state the grounds on which it is based." *Id.* (citation omitted). But "an objection on one ground does not preserve objections based on different grounds." *Id.* Thus, even assuming the defendant's objections to other jury instructions can be construed as directed at the instruction she now challenges on appeal, plain error review would still apply as the defendant did not object in the district court on the same grounds. *See United States v. Kobito*, 994 F.3d 696, 700 (4th Cir. 2021); *United States v. Zayyad*, 741 F.3d 452, 459 (4th Cir. 2014); *United States v. Bennett*, 986 F.3d 389, 397 (4th Cir. 2021); *United States v. Benton*, 523 F.3d 424, 428 (4th Cir. 2008).

To establish plain error, the defendant must demonstrate that (1) the district court committed an error; (2) the error was plain; and (3) the error affected her substantial rights. *See Henderson v. United States*, 568 U.S. 266, 272 (2013). A

"plain" error is one that is "clear" or "obvious," *United States v. Olano*, 507 U.S. 725, 734 (1993), under "the settled law of the Supreme Court or this circuit." *United States v. Carthorne*, 726 F.3d 503, 516 (4th Cir. 2013) (internal quotation marks omitted). As explained below, the defendant cannot establish any error, let alone one that is plain.

Moreover, the defendant's argument fails on the merits for two reasons. First, the conduct underlying Counts Four and Five (unlawful monetary transactions using the proceeds of crime) were charged in the Indictment as part of the conspiracy alleged in Count One. In the Indictment, under the heading of Count One, the nature and purposes of the conspiracy are stated to be "to spend [the fraud] proceeds on items that were not authorized under the PPP." JA28.

Count One also states, "It was a further part of the conspiracy that, once [the defendant and her co-defendant] obtained the proceeds of the [PPP loans] . . . , they knowingly spent those proceeds in part on numerous items that they knew were not authorized under the PPP." JA11-JA12. Under the heading for Counts Four and Five in the Indictment, it states that the defendant, "having participated in the transfer of the proceeds of specified unlawful activity . . . , knowingly engaged in a monetary transaction in criminally derived property . . . which funds were derived from specified unlawful activity, namely, proceeds of the conspiracy to commit

48

bank fraud alleged in Count 1 of this Indictment." Clearly, the conduct underlying Counts Four and Five was contemplated in the conspiracy charged in Count One.

Second, even if this Court concludes that Counts Four and Five were not contemplated by the conspiracy charged in Count One, the jury instructions make clear that the defendant was convicted of Counts Four and Five, not based on conspiracy liability for the actions of a co-conspirator, but based on her own direct, substantive actions with respect to those counts. In other words, this Court's instructions on Counts Four and Five made it clear that the jury could only find the defendant guilty of those counts if the defendant herself engaged in the substantive conduct constituting those offenses. The jury is presumed to have followed this instruction. *See United States v. Zelaya*, 908 F.3d 920, 930 (4th Cir. 2018).

The district court instructed the jury as follows: "In order to fulfill its burden of proof for the crime of engaging in monetary transactions in criminally derived property as charged in Counts 4 and 5 of the indictment, the government must prove the following five essential elements beyond a reasonable doubt: One, *the defendant* engaged or attempted to engage in a monetary transaction in or affecting interstate commerce. . . . And four, *the defendant* acted knowingly, that is, with knowledge that the transaction involved the proceeds of a criminal offense." JA881 (emphases added).

These instructions, taken as a whole, adequately state the controlling legal

49

principles governing the defendant's conviction on Counts Four and Five. Furthermore, the evidence demonstrates that the jury convicted the defendant based on her substantive money laundering conduct.

Count Four charged the defendant with the transfer of $1,000,000 of PPP funds from the Papillon Air, Inc. business account at Bank of America to a business account at Wells Fargo in the name of a new Papillon company called Papillon Air Maintenance Services, Inc. ("PAMS"). JA39. According to trial testimony from the consultant, the defendant and Kindambu started PAMS together, the defendant was the majority shareholder in PAMS, and the defendant continued to run and control it after Kindambu was arrested. JA274.

According to trial testimony from a Wells Fargo banker, Kindambu and the defendant both had access to the PAMS business account, and the defendant was listed at controlling a 67% share in PAMS. ECF No. 183 at 36-39. They opened this account two days after Papillon Air, Inc. received the PPP loan funds. Several days later, $1,000,000 of PPP funds was transferred from the Papillon Air, Inc. account at Bank of America to the PAMS account at Wells Fargo. *Id.* at 50. Over $400,000 of those funds were later used as the down payment for the luxury home that the defendant and Kindambu purchased together in Leesburg. JA641-JA645. The defendant was listed as the primary borrower on the mortgage for that home. JA644. In this way, the jury saw that the defendant was directly involved in the

transfer of funds that served as the factual basis for the charge in Count Four.

Count Five charged the defendant with the transfer of $31,500 of PPP funds from the Papillon Air, Inc. account to her personal account, which was in her name. She was the sole owner and controller of that account. At trial, the jury saw the text message that the defendant sent to Kindambu requesting this transfer of $31,500. JA630. In the messages that followed, the coupled discussed how best to transfer this money such that it would be easy to justify its source if anyone asked them about it. JA630-JA631. In the end, Kindambu stated, "Send me the BOA. Will wire when I am back. Will use Papillon Holdings or Air." The defendant responded with the routing and account numbers for her personal Bank of America account. In this way, the jury saw that the defendant was directly involved in the transfer of funds that served as the factual basis for the charge in Count Five.

For this reason, even assuming the district court plainly erred in instructing the jury, the defendant cannot show that the error affected her substantial rights.

## Conclusion

The defendant was an active, assertive, and enthusiastic participant in a criminal conspiracy that obtained over $2.5 million in fraud proceeds. The government presented overwhelming evidence that the defendant had the requisite *mens rea* to be found guilty. The district court properly instructed the jury on all the counts of conviction. For these reasons, this Court should affirm the judgment.

Respectfully submitted,

Jessica D. Aber
United States Attorney

/s/
Jordan Harvey
Assistant United States Attorney

**Statement Regarding Oral Argument**

The United States respectfully suggests that oral argument is not necessary in this case. The legal issues are not novel, and oral argument likely would not aid the Court in reaching its decision.

**Certificate of Compliance**

I certify that this brief was written using 14-point Times New Roman typeface and Microsoft Word 2016.

I further certify that this brief does not exceed 13,000 words (and is specifically 12,518 words) as counted by Microsoft Word, excluding the table of contents, table of authorities, signature block, statement regarding oral argument, this certificate, the certificate of service, and any addendum.

I understand that a material misrepresentation can result in the Court's striking the brief and imposing sanctions.

/s/
_____

Jordan Harvey
Assistant United States Attorney

53

**Certificate of Service**

I certify that, on April 12, 2024, I electronically filed the foregoing response brief with the Clerk of the Court by sending it through email to 4cca-filing@ca4.uscourts.gov and to opposing counsel's email address (ofc@mdmillerlaw.com).

By:    _____/s/_____

Jordan Harvey
Assistant United States Attorney